236 U.S. 615 (1915)
MICHIGAN CENTRAL RAILROAD COMPANY
v.
MICHIGAN RAILROAD COMMISSION.
No. 91.
Supreme Court of United States.
Submitted December 1, 1914.
Decided March 8, 1915.
ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.
*616 Mr. Frank E. Robson and Mr. Henry Russell for plaintiff in error.
Mr. Grant Fellows, Attorney General of the State of Michigan, for defendant in error.
*620 MR. JUSTICE PITNEY delivered the opinion of the court.
This writ of error brings under review a judgment of the Supreme Court of Michigan (168 Michigan, 230), awarding a peremptory writ of mandamus directing plaintiff in error, with respect to intrastate traffic, to interchange cars, carload shipments, less than carload shipments, and passenger traffic with the Detroit United Railway at the point of physical connection between the tracks *621 of the two companies in the village of Oxford in that State.
The Michigan Railway Commission, defendant in error, is a public administrative body, continued and existing under Act No. 300 of the Public Acts of 1909 as the successor of a similar commission established by Act No. 312 of the Public Acts of 1907. It has ample regulative powers, originally conferred by the 1907 act and continued by the 1909 act without modification material to the present controversy.[1] The mandamus proceeding was based *622 upon an order made by the former Commission in the year 1908, which, it is admitted, was preserved by § 49 of the 1909 act.
*623 The Michigan Central Railroad Company is a corporation existing under the General Railroad Law of the State (Comp. Laws 1897, ch. 164, §§ 6223 et seq.), and as lessee operates a line of railroad extending from Detroit to Bay City and passing through the village of Oxford, all in *624 the State of Michigan; this line being part of a railroad system extending through that State and into adjoining States and the Dominion of Canada, and over which the company transports passengers and property in interstate and foreign, as well as intrastate commerce. The Detroit United Railway Company is a corporation organized and existing under the Street Railway Act (Comp. Laws 1897, ch. 168, §§ 6434 et seq.), and operates an interurban electric railway extending from Detroit to the city of Flint, and likewise passing through the village of Oxford. Between Oxford and Flint, which are 28 miles apart, the line passes through the villages of Ortonville, Goodrich, and Atlas, distant respectively 10, 16, and 18 miles from Oxford.
In the early part of the year 1908 petitions were filed before the Commission by certain merchants resident in Ortonville and Goodrich, asking that a physical connection be established between the tracks of the Michigan Central and Detroit United at Oxford for the interchange of cars, carload shipments, less than carload shipments, and passenger traffic. The Michigan Central answered denying that it would be practicable to construct and maintain such a physical connection, and denying the authority of the Commission to order any such connection for the purposes mentioned in the complaint. The Detroit United answered denying the practicability of interchanging carload shipments (supposing a physical connection to have been established), without unreasonable expenditure of money in changing its road and equipment. There was a full hearing, at which both companies were represented. The questions before the Commission were three: (a) Is a physical connection between the tracks at Oxford practicable; (b) Can the interchange of business be accomplished without endangering the equipment, tracks, or appliances of either party; and (c) Are the facts and circumstances such as to reasonably justify *625 the Commission in requiring such connection and interchange. The question of through billing was not involved. The Commission held that the statute in terms conferred upon it the authority which it was asked to exercise, and declined to pass upon the question of its validity, deeming that to be a judicial question and not within its province. It found the construction and maintenance of the connection between the tracks to be feasible and practicable, and the expense of construction approximately $500. Upon the evidence introduced and a personal inspection of the line of the Detroit United, the Commission found that line to be of standard gauge, with rails of the same pattern and weight as those used on many steam roads, and without heavy grades offering resistance to freight traffic, and that the handling of freight in steam railroad cars over that line was practicable and might be accomplished without endangering the equipment, tracks, or appliances of either company, and without involving either in unreasonable expense. Whether steam or electricity should be used as a motive power was declared to be a question to be solved by the Detroit United Company in the light of its own experience. The Commission also found the proposed interchange to be reasonable from the standpoint of the Michigan Central, and that it entailed small sacrifice to that company, which would have to expend its proportion of the amount necessary to install the connection, but would not be involved in further expenditure; and that the business to be derived from Ortonville, Goodrich, and the surrounding country via the Detroit United Railway and the proposed connection promised to be considerable in amount, making the Michigan Central a beneficiary by the connection; and held that under its charter it owed a duty as common carrier to the entire State, so that while required to give greatest consideration to those most accessible to its operations, it must further give as great consideration to those not immediately *626 upon its lines as was consistent with the other operations of the road. The result was an order, dated June 5, 1908, made under the provisions of § 7 b of the 1907 act, requiring the Michigan Central and Detroit United Companies on or before August 15 in the same year to connect their tracks at such point in the village of Oxford as they should between themselves agree upon as most desirable, and thereafter to interchange cars, carload shipments, less than carload shipments, and passenger traffic at that point, in accordance with the provisions of § 7; and declaring that if they should be unable to agree as to the point of connection the Commission would make a supplemental order determining its location. Such a supplemental order was afterwards made. These orders were duly served upon both companies, and neither instituted any proceeding to test their validity in the manner permitted by §§ 25 and 26 of the 1907 act. The physical connection between the tracks was installed and is still maintained by the companies, and no question is now made respecting this. But the Michigan Central complied, to the extent of installing the physical connection, under protest, particularly with respect to so much of the order as required the interchange of cars, carload and less than carload shipments, and passenger traffic at that point. The Detroit United is willing and able to accept cars and carloads of freight from the Michigan Central, to be delivered along the line of the Detroit United under a service similar to that offered by belt lines and terminal railroads in the same State, but the Michigan Central has hitherto refused and still refuses to deliver cars and carloads or less than carload shipments of freight in cars to the Detroit United for transportation to points upon its line. There is no controversy about the other parts of the order.
The issuance of the mandamus was opposed upon the ground (among others), that the Commission's order and the statutes purporting to authorize it were repugnant to *627 the Fourteenth Amendment, in that enforcement of the order would deprive the Michigan Central of its property without due process of law, and also upon the ground that the order amounted to an attempt to regulate and impose a burden upon interstate commerce contrary to § 8 of Article I of the Constitution of the United States. The Supreme Court of Michigan held that the statute authorized the making of such an order by the Commission, and that since plaintiff in error had failed to institute proceedings to review it under §§ 25 and 26 of the Act the questions of the practicability of the physical connection and of the interchange of traffic, as well as the reasonableness of the service required, were not open in the mandamus proceeding. It also held that the jurisdiction of the Commission was limited to intrastate traffic, and that its order in the present case must be deemed to be so limited.
The act establishing the Michigan Railroad Commission, as it stood after amendment by Public Acts 1911, No. 139, was under consideration in Grand Trunk Ry. v. Michigan Ry. Comm., 231 U.S. 457, which dealt with the compulsory interchange of intrastate traffic at Detroit. With respect to judicial review, it will be observed that by § 25 (set forth in the margin, supra) the regulations prescribed by the Commission are to be treated as lawful and reasonable until found otherwise in an action brought for the purpose pursuant to the provisions of § 26, or until modified by the Commission as provided in § 24. Section 26 permits the railroad company or other party in interest, being dissatisfied with the Commission's order, to commence an action in the Circuit Court in chancery to set it aside on the ground of unreasonableness, with opportunity to introduce original evidence in addition to that which was submitted to the Commission. If new evidence is offered the court may refer it to the Commission for its consideration, and that body may thereupon *628 rescind or modify the original order. The court passes upon either the original or the modified order, and may affirm or set it aside in whole or in part, and make such other order as may be in accordance with the facts and the law. From its judgment there is an appeal to the Supreme Court. The respective functions of the Commission and the courts under this legislation were considered, in a rate case, by the state Supreme Court in Detroit & Mackinac Ry. v. Michigan Railroad Comm'n, 171 Michigan, 335, 346, and by this court in a subsequent case between the same parties, 235 U.S. 402, affirming 203 Fed. Rep. 864.
The argument submitted here in behalf of plaintiff in error has taken a wide range, many of the contentions being matters purely of local law, and these so interwoven with the discussion of Federal questions that it is somewhat difficult to distinguish them. It ought to be unnecessary to say that whether distinctions have heretofore been recognized, under the laws of Michigan, between "railroads" and "street railways"; whether the acts of 1907 and 1909 preserve or disregard these distinctions; and whether § 7 was intended to apply to both kinds of roads or to "railroads" only; are questions with which this court has no proper concern, they being conclusively disposed of by the decision of the state court of last resort in the present case. So, also, it is, for all purposes of our jurisdiction, established not only that the Commission in making the order, acted in the authorized exercise of the State's power of regulation, but that the two companies are legally competent to perform the duties thereby imposed upon them respectively.
That a State, in virtue of its authority to regulate railroads as public highways, may in a proper case require two companies to make a connection between their tracks so as to facilitate the interchange of traffic, without thereby violating rights secured by the Constitution of the United *629 States, is settled by the decisions of this court in Wisconsin &c. R.R. v. Jacobson, 179 U.S. 287, 296, 301; and Oregon R.R. & N. Co. v. Fairchild, 224 U.S. 510, 528.
That a State, acting within its jurisdiction and not in hostility to any Federal regulation of interstate commerce, may compel the carrier to accept loaded cars from another line and transport them over its own, such requirement being reasonable in itself, is settled by Chi., Mil. & St. P. Ry. v. Iowa, 233 U.S. 334, 344. In that case it was held there was no essential difference, so far as concerned the power of the State, between such an order and one requiring the carrier to make track connections and receive cars from connecting roads in order that reasonably adequate facilities for traffic might be provided.
It seems to us that the principle of these decisions sustains also the State's power to make a reasonable order requiring a carrier to permit empty or loaded cars owned by it to be hauled from its line upon the connecting line for purposes of loading or delivery of intrastate freight, and to permit the cars of other carriers loaded with such freight consigned to points on the connecting line to be hauled from its line upon the connecting line for purposes of delivery. This question was left undetermined in McNeill v. Southern Railway, 202 U.S. 543, 563, which had to do with a state regulation operating directly upon interstate commerce.
The contentions of plaintiff in error to the contrary will be briefly considered.
It is said that section 7 b of the 1907 act, as reenacted in 1909, under which the Commission's order was made, permits the use of suburban and interurban railroads for the handling of freight in carload lots in steam railroad freight cars only "in the same manner and under the same general conditions, except as to motive power, as belt line railroads and terminal railroads are now or may hereafter be used for like purposes." And it is insisted that the *630 terms "belt line railroads" and "terminal railroads" have not been judicially construed by the Michigan courts, and, there being no finding by the Commission or the court upon the question, the order and judgment are in this respect indefinite. But the Commission in its petition for mandamus averred: "That belt line and terminal railroads within this State vary in length from a fraction of a mile to fifteen miles or more; that cars and carloads of freight are transported to and from industries located along the line of such belt or terminal railroads to the tracks of railroad companies with which said belt lines and terminal railroads are connected, under a local switching charge or tariff, and that through billing of freight as between other railroads and belt and terminal railroads is not customary or usual." And in the answer of the Railroad Company this was admitted as matter of fact, it being at the same time insisted "that said Detroit United Railway Company is not in fact or in law a belt line or terminal railroad corporation, nor authorized by law to act as such; nor are the line or lines of railway operated by it extending from the village of Oxford to the City of Flint and within the boundaries of said municipalities, belt or terminal railroads; nor can they in fact or in law be used as belt or terminal railroads may be or are now used; nor has said relator any power or authority to require this respondent to give the use of its tracks or terminal facilities for the purposes mentioned in said orders or otherwise." There is no question, therefore, as to the mode in which belt line and terminal railroads are in fact used, and so the statute and order are relieved from the charge of indefiniteness in this respect. As already shown, the decision of the state court of last resort is a conclusive response to the legal objections taken in the clause quoted from the answer.
It is said the statute as construed and enforced by the Commission and the Supreme Court is repugnant to the "due process" clause because it in effect requires a delivery *631 by the Michigan Central at points off its own lines. By its terms, however, the order does not require the Michigan Central to haul the cars to points on the Detroit United, but only to permit them to be hauled by the latter company. At common law a carrier was not bound to carry except on its own line, and probably not required to permit its equipment to be hauled off the line by other carriers. A., T. & S.F.R.R. v. D. & N.O.R.R., 110 U.S. 667, 680; Kentucky &c. Bridge Co. v. Louis. & Nash. R.R., 37 Fed. Rep. 567, 620; Oregon Short Line v. Northern Pacific Ry., 51 Fed. Rep. 465, 472, 475; affirmed, 61 Fed. Rep. 158. But in this, as in other respects, the common law is subject to change by legislation; and, so long as the reasonable bounds of regulation in the public interest are not thereby transcended, the carrier's property cannot be deemed to be "taken" in the constitutional sense. Minn. & St. Louis R.R. v. Minnesota, 193 U.S. 53, 63; Atlantic Coast Line v. N. Car. Corp. Com'n, 206 U.S. 1, 19; Grand Trunk Ry. v. Michigan Ry. Com., 231 U.S. 457, 470; Wisconsin &c. R.R. v. Jacobson, supra; Chi., Mil. & St. P. Ry. v. Iowa, supra.
The insistence that the property of plaintiff in error in its cars is taken by the order requiring it to deliver them to the Detroit United Railway involves, as we think, a fundamental error, in that it overlooks the fact that the vehicles of transportation, like the railroad upon which they run, although acquired through the expenditure of private capital, are devoted to a public use, and thereby are subjected to the reasonable exercise of the power of the State to regulate that use, so far at least as intrastate commerce is concerned. Munn v. Illinois, 94 U.S. 113. That it is not as a rule unreasonable to require such interchange of cars sufficiently appears from the universality of the practice, which became prevalent before it was made compulsory, and may be considered as matter of common knowledge, inasmuch as a freight train made up wholly *632 of the cars of a single railroad is, in these days, a rarity. In Michigan, car interchange has long been a statutory duty. Mich. Gen. Acts 1873, No. 79, § 15, p. 99; No. 198, § 28, p. 521; Michigan Central R.R. v. Smithson, 45 Michigan, 212, 221. And see Peoria & P.U. Ry. v. Chicago, R.I. & P. Ry., 109 Illinois, 135, 139; Burlington &c. Ry. v. Dey, 82 Iowa, 312, 335; State v. Chicago &c. Ry., 152 Iowa, 317, 322; affirmed, 233 U.S. 334; Pittsburgh &c. Ry. v. R.R. Commission, 171 Indiana, 189, 201; Jacobson v. Wisconsin &c. R.R., 71 Minnesota, 519, 531; affirmed, 179 U.S. 287.
To speak of the order as requiring the cars of plaintiff in error to be delivered to the Detroit United "for the use of that company" involves a fallacy. The order is designed for the benefit of the public having occasion to employ the connecting lines in through transportation. The Detroit United, like the Michigan Central, acts in the matter as a public agency.
The contention that no provision is made for the paramount needs of plaintiff in error for the use of its own equipment, nor for the prompt return or adjustment for loss or damage to such equipment, nor for compensation for the use thereof, is not substantial. The order is to receive a reasonable interpretation, and according to its own recitals is to be read in the light of the opinion of the Commission, which shows that it is not intended to have an effect inconsistent with the other operations of the company. It was expressly found that there was no special ground for apprehending loss or damage to the equipment. Certainly the order does not exclude the ordinary remedies for delay in returning cars or for loss or damage to them. Nor does it contemplate that plaintiff in error shall be required to permit the use of its cars (or of the cars of other carriers for which it is responsible) off its line without compensation. The state court expressly held that § 7 c provides for reasonable compensation to the *633 carrier whose cars are used in the interchange. The finding of the Commission, approved by the court, was that the Michigan Central would merely have to expend its proportion of the amount necessary to install the connection between the two roads, and would be called upon for no further expenditure in the premises, and that the business to be derived by it from Ortonville, Goodrich, and the surrounding country via the Detroit United Railway, promised to be considerable in amount, and thereby the Michigan Central would be a beneficiary from the proposed connection and interchange. It was, we think, permissible for the court to find, as in effect it did find, that the benefits thus derived would include compensation for the use of the cars of the Michigan Central for purposes of loading and delivery along the line of the Detroit United. We are unable to see that any question as to the adequacy of the compensation was raised in the state court.
Plaintiff in error relies upon Central Stock Yards v. Louis. & Nash. R.R., 192 U.S. 568, and Louis. & Nash. R.R. v. Stock Yards Co., 212 U.S. 132. The former of these was an action in the Federal court and came here by appeal from the Circuit Court of Appeals. This court held as a matter of construction that the constitution of Kentucky did not require that the railroad company should deliver its own cars to another road. The second case was a review of the judgment of the court of last resort of the State. That court having held that the state constitution did require the carrier to deliver its own cars to the connecting road, it was contended that this requirement was void under the Fourteenth Amendment as an unlawful taking of property. This court said (212 U.S. 143): "In view of the well known and necessary practice of connecting roads, we are far from saying that a valid law could not be passed to prevent the cost and loss of time entailed by needless transshipment or breaking bulk, in case of an *634 unreasonable refusal by a carrier to interchange cars with another for through traffic. We do not pass upon the question. It is enough to observe that such a law perhaps ought to be so limited as to respect the paramount needs of the carrier concerned, and at least could be sustained only with full and adequate regulations for his protection from the loss or undue detention of cars, and for securing due compensation for their use. The constitution of Kentucky is simply a universal undiscriminating requirement, with no adequate provisions such as we have described. . . . We do not mean, however, that the silence of the constitution might not be remedied by an act of legislature or a regulation by a duly authorized subordinate body if such legislation should be held consistent with the state constitution by the state court." The case now before us is plainly distinguishable, as appears from what we have said. And, upon the whole, we see no sufficient ground for denouncing the regulation in question as either arbitrary or unreasonable.
There remains the contention that the statute and the order made in pursuance of it operate as a burden upon and interference with interstate commerce. That the order intrinsically applies only to intrastate traffic was held by the state court in this case, upon the ground that the jurisdiction of the Commission is thus limited; and in this the court did but follow its previous ruling in Ann Arbor R.R. v. Railroad Commission, 163 Michigan, 49. Therefore, the contention under the Commerce Clause is narrowed to the single point that the order requires the cars of the Michigan Central to be turned over to the connecting carrier "at all times and under all circumstances and without reference to the needs and demands of interstate commerce." But it seems to us that this is an unreasonable construction of the order. By its terms, as thus far construed by the state court, it merely requires the two companies to interchange cars, carload shipments, *635 less than carload shipments and passenger traffic, in accordance with the provisions of § 7 of the Act, that is to say, "in the same manner and under the same general conditions except as to motive power as belt line railroads and terminal railroads are now or may be used for like purposes." Manifestly, this involves no disregard of the needs of interstate commerce, and we must indulge the presumption, until the contrary is made to appear, that the State will not so construe or enforce the order as to interfere with or obstruct such commerce. Ohio Tax Cases, 232 U.S. 576, 591; St. Louis S.W. Ry. v. Arkansas, 235 U.S. 350, 369. The recent decisions of this court, cited in support of the contention that the order interferes with interstate commerce (Houston & Tex. Cent. R.R. v. Mayes, 201 U.S. 321, 329; McNeill v. Southern Railway, 202 U.S. 543, 561; St. Louis S.W. Ry. v. Arkansas, 217 U.S. 136, 149; Chi., R.I. &c. Ry. v. Hardwick Elevator Co., 226 U.S. 426, 433); are so plainly distinguishable that no time need be spent in discussing them.
Judgment affirmed.
NOTES
[1] Michigan Public Acts 1907, No. 312.

"SEC. 7. . . . (b) Where it is practicable and the same may be accomplished without endangering the equipment, tracks, or appliances of either party, the commission may, upon application, require steam railroads and interurban and suburban railroads to interchange cars, carload shipments, less than carload shipments, and passenger traffic, and for that purpose may require the construction of physical connections upon such terms as it may determine: Provided, That nothing in this act shall be construed to require through billing of freight as between steam and electric, suburban or interurban railroads, but such suburban and interurban railroads may be used for the handling of freight in carload lots in steam railroad freight cars between shippers or consignees and the steam railroads, in the same manner and under the same general conditions, except as to motive power, as belt line railroads and terminal railroads are now or may hereafter be used for like purposes.
"(c) Every corporation owning a railroad in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation or individual having connecting tracks: Provided, Such cars are of the proper gauge, are in good running order and equipped as required by law and otherwise safe for transportation and properly loaded: Provided further, If the corporations cannot agree upon the times at which the cars shall be drawn, or the compensation to be paid, the said commission shall, upon petition of either party and notice to the other, after hearing the parties interested, determine the rate of compensation and fix such other periods, having reference to the convenience and interests of the corporation or corporations, and the public to be accommodated thereby, and the award of the commission shall be binding upon the respective corporations interested therein until the same shall have been revised. . . .
"SEC. 24. . . . (b) The commission may at any time, upon application of any person or any railroad, and upon notice to the parties interested, including the railroad, and after opportunity to be heard as provided in section twenty-two, rescind, alter or amend any order fixing any rate or rates, fares, charges or classifications, or any other order made by the commission, and certified copies shall be served and take effect as herein provided for original orders.
"SEC. 25. All rates, fares, charges, classifications and joint rates fixed by the commission and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie, lawful and reasonable until finally found otherwise in an action brought for the purpose pursuant to the provisions of section twenty-six of this act, or until changed or modified by the commission as provided for in paragraph (b), section twenty-four of this act.
"SEC. 26. (a) Any railroad or other party in interest, being dissatisfied with any order of the commission fixing any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices or services, may within sixty days commence an action in the circuit court in chancery against the commission as defendant to vacate and set aside any such order on the ground that the rate or rates, fares, charges, classifications, joint rate or rates fixed is unlawful or unreasonable, or that any such regulation, practice or service fixed in such order is unreasonable; in which suit the commission shall be served with a subpoena. The commission shall file its answer, and on leave of court any interested party may file an answer to said complaint, whereupon said action shall be at issue and stand ready for hearing upon ten days' notice by either party. All suits brought under this section shall have precedence over any civil cause of a different nature pending in such court, and the circuit court shall always be deemed open for the hearing thereof, and the same shall proceed, be tried and determined as other chancery suits. Any party to such suit may introduce original evidence in addition to the transcript of evidence offered to said commission, and the circuit courts in chancery are hereby given jurisdiction of such suits and empowered to affirm, vacate or set aside the order of the commission in whole or in part, and to make such other order or decree as the courts shall decide to be in accordance with the facts and the law.
* * * * * * * *
"(c) If, upon the trial of said action, evidence shall be introduced by the complainant which is found by the court to be different from that offered upon the hearing before the commission, or additional thereto, the court, before proceeding to render judgment, unless the parties in such action stipulate in writing to the contrary, shall transmit a copy of such evidence to the commission, and shall stay further proceedings in said action for fifteen days from the date of such transmission. Upon receipt of such evidence the commission shall consider the same, and may alter, modify, amend and rescind its order relating to such rate or rates, fares, charges, classifications, joint rate or rates, regulations, practice or service complained of in said action, and shall report its action thereon to said court within ten days from the receipt of such evidence.
"(d) If the commission shall rescind its order complained of, the action shall be dismissed; if it shall alter, modify or amend the same, such altered, modified or amended order shall take the place of the original order complained of, and judgment shall be rendered thereon as though made by the commission in the first instance. If the original order shall not be rescinded or changed by the commission, judgment shall be rendered upon such original order.
"(e) Either party to said action, within sixty days after service of a copy of the order or judgment of the court, may appeal to the supreme court, which appeal shall be governed by the statutes governing chancery appeals. When the appeal is taken the case shall, on the return of the papers to the supreme court, be immediately placed on the calendar of the then pending term, and shall be brought to a hearing in the same manner as other cases on the calendar, or, if no term is then pending, shall take precedence of a different nature (sic), except criminal cases at the next term of the supreme court.
"(f) In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."
The foregoing provisions were substantially reenacted in Public Acts 1909, No. 300, as §§ 7 b and c, 24, 25, 26 a, c, d, and e respectively.