THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE NEW YORK CENTRAL RAILROAD COMPANY and INTERNATIONAL RAILWAY COMPANY, Relators, *v.* THE PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK FOR THE SECOND DISTRICT and Others, Respondents.

Third Department, March 7, 1917.

Railroads — authority of Public Service Commission under section 35 of Public Service Commissions Law to direct two railroads to make track connections and lay switches and sidings so as to afford a proper system for interchange of freight cars.

Under section 35 of the Public Service Commissions Law, providing in part that "Every common carrier is required to afford all reasonable, proper and equal facilities for the interchange of passenger and property traffic between the lines owned, operated, controlled or leased by it and the lines of every other common carrier," and also that "This section shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks or terminal facilities," the Public Service Commission is prohibited from directing the New York Central Railroad Company and the International Railway Company to make such track connections and lay such switches and sidings as to constitute an adequate and convenient system for the interchange of freight cars between the two railroads in the portion of the city of Lockport known as Upper Town, it appearing that said city is divided into two sections, Upper Town and Lower Town; that the industries of Lower Town are served by both railroads operating over certain tracks used in common pursuant to an agreement; that the industries of Upper Town, which is at an elevation of about 180 feet above Lower Town and about one mile therefrom, have no track common to both railroads and have no interchange system for freight cars, but each industry is served by its individual switch connection, and that as to Upper Town, the nearest interchange system between the two railroads is at North Tonawanda, fourteen miles from Lockport.

CERTIORARI issued out of the Supreme Court and attested, on the 18th day of December, 1915, directed to The Public Service Commission of the State of New York for the Second District and others, commanding them to certify and return to the office of the clerk of the county of Albany all and singular their proceedings had in directing the relators to make such switch or track connections as shall be necessary to establish adequate and convenient interchange of freight between their

railroads in the city of Lockport, N. Y., and in directing them to file with the Commission tariff schedules of their charges for the switching service involved in the interchange and in denying their applications for a rehearing.

*Hoyt & Spratt* [*Maurice C. Spratt* of counsel], for the relator New York Central Railroad Company.

*Cohn, Chorman & Francho* [*Morris Cohn* of counsel], for the relator International Railway Company.

*M. B. Pierce*, for the Erie Railroad Company, intervenor.

*Hickey, Thompson & Gold* [*Charles Hickey* of counsel], for the complainants Lockport Board of Commerce and others.

*Ledyard P. Hale* counsel for the Public Service Commission.

LYON, J.:

This proceeding has been taken to review an order of the Public Service Commission, Second District, directing that the relators make such track connections and lay such switches and sidings as to constitute an adequate and convenient system for the interchange of freight cars between the two railroads in the portion of the city of Lockport known as Upper Town.

The New York Central railroad's line from Rochester to North Tonawanda passes through Lockport and is operated by steam. The International Railway is operated by electricity and is the lessee of the Lockport branch of the Erie railroad, running through North Tonawanda and terminating at Lockport. The International also operated an electric railway extending from Lockport to Olcott on Lake Ontario, as well as the street railway system in Lockport.

The city of Lockport is divided into two sections, Upper Town and Lower Town. Industries of Lower Town are served by both railroads operating over certain tracks which are used in common pursuant to an agreement between the relators. The industries of Upper Town, which is at an elevation of about 180 feet above Lower Town and about one mile therefrom, have no track common to both railroads, and have no

**210** People ex rel. N. Y. C. R. R. Co. *v.* Pub. Serv. Comm.

Third Department, March, 1917.                    [Vol. 177.

interchange system for freight cars, but each industry is served by its individual switch connecting with one or the other of the two railroads.   As to Upper Town, the nearest interchange system between the railroads is at North Tonawanda, fourteen miles from Lockport.   In the shipment of outgoing freight, where delivery is desired at a point upon the line of the other company, it is necessary to dray the freight to a car standing upon the track of the other company, or to send the car at local rates to North Tonawanda, where interchange can be made. As to a shipment into Lockport originating upon the road other than that upon which the Upper Town industry is situated, it is necessary either to have the car interchanged at North Tonawanda, paying local rates from there to Lockport, or if received in Lockport to have it sent back to North Tonawanda, interchanged and returned, or for the consignee to haul the freight from the car to his plant.

The proceeding to compel an interchange of freight at Lockport was instituted before the Public Service Commission in 1908.   The original complainants were two industries in Upper Town, situated upon the line of the New York Central railroad.   Later other industries as well as the board of commerce of Lockport joined as complainants.   Answers were interposed by both relators, also by the Erie Railroad Company as intervenor.

Upon the hearings before the Commission the matter of the necessity and practicability of installing the interchanging system was the subject of much contradictory evidence.   The relators maintained that the situation of the two roads at converging points was such, the expense of installing an interchanging system so great and so disproportionate to the comparatively small number of transfers which would be made and to the trivial receipts of the relators therefor as to make the scheme unreasonable and impracticable and a losing venture for the relators.   These contentions of the relators were combated by the complainants.   Following the hearings the Commission made the order complained of.   Each of the relators having applied to the Commission for a rehearing, which was denied, this proceeding was instituted.   Upon the argument before us it was stipulated in open court that the Commission

did not question the right to review its decision by certiorari and that the order appealed from should be treated as a final order.

It has recently been held in *People ex rel. N. Y. & Queens Gas Co.* v. *McCall* (219 N. Y. 84) that the court has no power to substitute its judgment of what is reasonable in place of the determination of the Public Service Commission and can only annul the order of the Commission for the violation of some rule of law; that the control and regulation of common carriers is by law vested in the Public Service Commissions and that it was not intended that the courts should interfere with the Commissions or review their determinations further than necessary to keep them within the law and to protect the lawful rights of the corporations over which they were given control. In its opinion the court approves the following statement of the Minnesota Supreme Court in *State* v. *Great Northern Ry. Co.* (153 N. W. Rep. 247; 130 Minn. 57, 61): "The order may be vacated as unreasonable if it is contrary to some provision of the Federal or State Constitution or laws, or if it is beyond the power granted to the commission, or if it is based on some mistake of law, or if there is no evidence to support it, or if, having regard to the interest of both the public and the carrier, it is so arbitrary as to be beyond the exercise of a reasonable discretion and judgment."

Assuming, therefore, that the findings of the Commission to the effect that favorable locations exist for making connection and installing an interchanging system between the two railroads are warranted and that the facts and circumstances supported by evidence are such as to reasonably justify the Commission in ordering the making of such connection and interchange, and, hence, that the decision of the Commission upon the facts is final, we pass to a consideration of relators' second contention that the Commission was prohibited by law from making the order.

The Public Service Commissions Law (Consol. Laws, chap. 48; Laws of 1910, chap. 480), section 35, provides: "Every common carrier is required to afford all reasonable, proper and equal facilities for the interchange of passenger and property traffic between the lines owned, operated, controlled or leased by it

**212** People ex rel. N. Y. C. R. R. Co. *v.* Pub. Serv. Comm.

Third Department, March, 1917. [Vol. 177.

and the lines of every other common carrier. \* \* \* This section shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks or terminal facilities. Every common carrier, as such, is required to receive from every other common carrier, at a connecting point, freight cars of proper standard, and haul the same through to destination, if the destination be upon a line owned, operated or controlled by such common carrier, or if the destination be upon a line of some other common carrier, to haul any car so delivered through to the connecting point upon the line owned, operated, controlled or leased by it, by way of route over which such car is billed, and there to deliver the same to the next connecting carrier. \* \* \*." We know of no decision, and are referred to none by the briefs of counsel, in which the precise question at issue here has been passed upon by the courts of our State.

However, the matter has been the frequent subject of adjudication, both as to intrastate and interstate traffic, by the United States courts under a very similar provision of the Federal statutes. Section 3 of chapter 104 of the act of February 4, 1887 (24 U. S. Stat. at Large, 380), provides as follows: "Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

In *Kentucky & I. Bridge Co.* v. *Louisville & N. R. Co.* (37 Fed. Rep. 567, 628) it was held that this clause was a limitation upon or qualification of the duty of affording all reasonable, proper and equal facilities for interchange, and that it was clearly left open to any common carrier to contract or enter into arrangements for the use of its tracks and terminal facilities with one or more connecting lines without subjecting itself to the charge of giving an undue or unreasonable preference or

advantage to such lines, or of discriminating against other carriers who were not parties to or included in such arrangements. In *Oregon Short Line & U. N. Ry. Co. v. Northern Pacific R. Co.* (51 Fed. Rep. 465) Mr. Justice FIELD expresses approval of the opinion in the foregoing case.

In *Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co.* (59 Fed. Rep. 400) the court, approving of the decisions in the two cases last cited, held that the tracks and terminal facilities of the defendants could only be used by the plaintiff railway for the exchange of interstate freight with the consent of the defendants. The district judge then said that this and other propositions having been established by two justices of the Supreme Court, he had no disposition to disregard their construction of the Interstate Commerce Act. Upon appeal (63 Fed. Rep. 775) this decision was unanimously affirmed.

In the case of *Louisville & Nashville R. R. Co. v. Stock Yards Co.* (212 U. S. 132, revg. 97 S. W. Rep. 778; 30 Kentucky Law Rep. 18) both interstate and intrastate shipments were involved. The livestock depot at Louisville of the Louisville and Nashville railroad was the Bourbon Stock Yards. The live stock depot of the Southern railway was the Central Stock Yards, just outside the boundary of Louisville. There was a physical connection between the two railroads at a point between the two stock yards, and also at another point a little farther north. The Louisville and Nashville railroad declined to receive live stock billed to the Central Stock Yards, or to deliver live stock destined for Louisville elsewhere than at the Bourbon Yards. The Central Stock Yards brought an action to compel the Louisville and Nashville to receive live stock tendered to it for the Central Stock Yards station, and to deliver the same at a point of physical connection between the defendant's road and the Southern railway for ultimate delivery to or at the Central Stock Yards. The Constitution of Kentucky (§ 213) provided: " All railroad, transfer, belt lines and railway bridge companies, organized under the laws of Kentucky, or operating, maintaining or controlling any railroad, transfer, belt lines or bridges, or doing a railway business in this State, shall receive, transfer deliver and switch empty or loaded cars, and shall move, transport, receive, load or unload all the freight in car-

loads or less quantities, coming to or going from any railroad, transfer, belt line, bridge or siding thereon, with equal promptness and dispatch, and without any discrimination as to charges, preference, drawback or rebate in favor of any person, corporation, consignee or consignor, in any matter as to payment, transportation, handling or delivery; and shall so receive, delliver, transfer and transport all freight as above set forth, from and to any point where there is a physical connection between the tracks of said companies. But this section shall not be construed as requiring any such common carrier to allow the use of its tracks for the trains of another engaged in like business."

Judgment was rendered against the Louisville and Nashville, ordering it, among other things, to receive at some point of physical connection with the tracks of the Southern railway, and particularly at a connection described, and to transfer, switch, transport and deliver all live stock consigned to any one at the Bourbon Stock Yards the shipment of which originated at the Central Stock Yards. This judgment was affirmed by the Court of Appeals of Kentucky, and the defendant appealed to the Supreme Court of the United States, which, in reversing the judgment, said (p. 144): " There remains for consideration only the third division of the judgment. * * * If the principle is sound, every road into Louisville, by making a physical connection with the Louisville and Nashville, can get the use of its costly terminals and make it do the switching necessary to that end, upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road, for the purpose of reaching and using its terminal station. To require such an acceptance from a railroad is to take its property in a very effective sense, and cannot be justified unless the railroad holds that property subject to greater liabilities than those incident to its calling alone." I have quoted thus fully from the case because of its resemblance to the case at bar.

In the case of *Pennsylvania Company* v. *United States* (236 U. S. 351; affg., 214 Fed. Rep. 445, and following *Grand Trunk Railway* v. *Michigan Railroad Commission*, 231 U. S. 457, and *United States* v. *St. Louis Terminal*, 224 id. 383, and

distinguishing *Louisville & Nashville R. R. Co.* v. *Stock Yards Co.*, 212 id. 132) it was said (p. 372): " All that the Commission ordered was that the company desist from the discriminatory practice here involved, and in so doing we think it exceeded neither its statutory authority nor any constitutional limitation, and that the District Court was right in so determining." The decision in that case was put expressly upon the ground that the carrier was refusing to receive and transport over its terminals carload interstate freight from one carrier having physical connection with its lines while at the same time it was performing such service for other connecting carriers similarly situated. "The sole question is," the court said (p. 362), "whether the Commission exceeded its authority in requiring the Pennsylvania Company to cease and desist from what the Commission found to be a discriminatory practice."

The only case cited in the opinion accompanying the decision of the Public Service Commission in the case at bar is *Michigan Central Railroad* v. *Michigan Railroad Commission* (236 U. S. 615; affg., 168 Mich. 230). In that case the complainants were residents of two villages situated on only one railroad, distant respectively ten and sixteen miles (or about the distance of North Tonawanda from Lockport) from the point of physical connection of the two railroads where it was sought to compel the roads to establish interchange of cars, freight and passenger traffic. The question as to the right of either road to have the use of the terminals of the other, if in fact terminals existed at the point of contact, was not considered and apparently was not involved.

In the case of *Louisville & Nashville Railroad* v. *United States* (242 U. S. 60), which is the latest reported utterance of the United States Supreme Court upon the subject (revg. 227 Fed. Rep. 258, 273), it was held by a closely divided court that the two appellant railroad companies, who were joint owners of a terminal, and each of whom paid for and through the joint agency performed the service incident to switching cars between the point of interchange and the industry whenever a car was moved in-bound or out-bound over its tracks, were protected by section 3 of the act to regulate commerce in the same degree as would be an owner in severalty from

216 People ex rel. N. Y. C. R. R. Co. v. Pub. Serv. Comm.

Third Department, March, 1917. [Vol. 177.

being required to give the use of their terminal facilities to another carrier engaged in like business. In the prevailing opinion the court, after quoting from the language of section 3 the words "shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business," said: "Therefore, if either carrier owned and used this terminal alone, it could not be found to discriminate against the Tennessee Central by merely refusing to switch for it, that is to move a car to or from a final or starting point from or to a point of interchange." Neither of these railroads was a terminal or belt railroad.

Many other decisions might be noted in which the question at issue here is discussed. So far as they arrive at opposite conclusions they are based upon facts clearly distinguishable from those in the case at bar, and are commented upon in the cases hereinbefore referred to.

The two provisions of section 35 of the Public Service Commissions Law are to be read together, and each given its due weight and proper meaning. So read, they are intelligible and consistent. The former provision of the section is applicable to shipments terminating at Lockport. The latter provision refers to connecting points in route, and in the case at bar is applicable to cars routed through Lockport by way of the International, which must be turned over by that company to the New York Central at North Tonawanda or Lockport to be carried towards their destinations.

The respondents refer to section 49, subdivision 3, of the Public Service Commissions Law as supporting their position. This provision gives the Commission power to require common carriers whose lines form a continuous or connecting line of transportation, or could be made to do so by the construction and maintenance of switch connection or interchange track at connecting points, or by transfer of passengers or property at connecting points, to establish through routes and joint rates, fares and charges for the transportation of passengers and property within the State as the Commission may by its order designate. · In the case at bar no through routes or joint rates have been established, and hence consideration of the provision is not material.

The word "terminals" is applicable to not only the portion of the main track, sidings and team tracks used in loading and unloading freight, but also to industrial switches at which freight shipments terminate. A terminal point is a place of consignment. (*Great Northern Ry. Co.* v. *Walsh,* 47 Fed. Rep. 406, 409.) The term is properly applied, within the meaning of a demurrage rule, to two yards four miles apart maintained by a railroad for the storage of freight cars. (*Pennsylvania R. R. Co.* v. *Marshall,* 147 App. Div. 806.) Demurrage, being a charge for the detention of a car until unloaded, is a terminal charge. (*Lehigh Valley R. Co.* v. *United States,* 188 Fed. Rep. 879, 885.) Terminal systems are instrumentalities which assist in the collection and distribution of traffic. (*United States* v. *St. Louis Terminal,* 224 U. S. 383, 402; *Waverly Oil Works Co.* v. *Penn. R. R. Co.,* 28 I. C. C. 621, 627; *Morris Iron Co.* v. *B. & O. R. R. Co.,* 26 id. 240, 244.)

The word "use" as applied to the provision prohibiting the use of the terminal facilities of one common carrier by another was not intended to be confined to the actual presence of the locomotives of the connecting carrier. "The running of freight cars over the track of another railroad without its consent is just as much 'use of the tracks' as if the locomotive was attached." (*Little Rock & M. R. Co.* v. *St. Louis, I. M. & S. Ry. Co.,* 59 Fed. Rep. 400.) "'The use' of tracks or terminal facilities referred to in that proviso [section 3 of the Federal act] is not limited to physical entry upon such tracks or terminal facilities by the power, equipment or employees of another carrier. We think that significance is to be attached to the words 'engaged in like business,' and that they may fairly be interpreted to mean 'competing for the same traffic.'" (*Louisville Board of Trade* v. *Louisville & Nashville R. R. Co.,* 40 I. C. C. 679, 690.)

The provision of section 35 of the Public Service Commissions Law that "this section shall not be construed to require a common carrier to permit or allow any other common carrier to use its tracks or terminal facilities" is definite and unambiguous, and the intent of the Legislature in enacting it apparently clear. At one of the early hearings before the Public Service Commission one of the commissioners suggested this pertinent

illustration of the reason for the enactment of the provision in question: "Suppose Road A has acquired at great expense terminals and terminal facilities in the City of Buffalo, and reaches to all the manufacturing establishments; Road B builds up to the city line and makes connection with Road A at the city line and gets the benefit of all of its terminals in the city without any expense to it at all, and a road which has invested a million dollars in terminals in the City of Buffalo has to furnish those terminals for the benefit of the road which has not put a dollar into the city at all for terminals to accommodate the public. That you have got to think of."

We think the determination complained of was unwarranted, and should be annulled and the matter remitted to the Commission.

All concurred.

Determination annulled and matter remitted to the Commission.