THE CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY COMPANY, Appellant, *vs.* THE STATE PUBLIC UTILITIES COMMISSION *et al.* Appellees.

*Opinion filed April 22, 1915.*

1. APPEALS AND ERRORS—*appellant cannot complain of alleged error affecting others, only.* An appellant railroad company can not complain of an alleged error which in no way injuriously affects its rights; and this rule applies to statutory as well as other proceedings.

2. RAILROADS—*what finding not necessary to validity of order of Railroad and Warehouse Commission.* Where the only effect of an order by the Railroad and Warehouse Commission is to continue in force a certain switching tariff until such time as it shall be changed by agreement or on a hearing and no new rate is established or attempted, it is not necessary to the validity of the order that it shall contain a finding that the railroads interested had refused or neglected to voluntarily establish a new rate or that such new rate is necessary.

3. SAME—*what does not amount to depriving a railroad company of property without due process of law.* An order of the Railroad and Warehouse Commission continuing in force, for a time, a certain switching tariff fixing the rate which a railroad company may charge for hauling coal over its line from the point where it is received from the forwarding carrier to its destination, the charge to be absorbed in the through rate, does not amount to taking the company's property without due process of law, on the theory that the order, in effect, turns over the company's tracks and terminal facilities to other railroads.

4. SAME—*matter of rate regulation is essentially one of legislative control.* The matter of rate regulation is essentially one of legislative control, and when such regulation has been made it will only be reviewed by the courts in so far as it is necessary to determine whether or not the rate is so unreasonable and unjust as to work a practical destruction of property rights or amount to a confiscation of property.

5. SAME—*when Supreme Court cannot pass upon reasonableness of order.* The Supreme Court cannot consider the reasonableness of an order of the Railroad and Warehouse Commission continuing in force, for a time, a certain switching tariff which was established by agreement of all parties interested after a most deliberate investigation involving many months of conferences and the consideration of conditions by experts, where the record does

not contain the necessary matters for a determination of that question and where the tariff is only continued in force until changed by agreement of the parties interested or upon a further hearing of the matter by the commission.

Appeal from the Circuit Court of Sangamon county; the Hon. James A. Creighton, Judge, presiding.

O. W. Dynes, C. S. Jefferson, and S. D. Scholes, (Burton Hanson, of counsel,) for appellant.

M. F. Gallagher, E. B. Wilkinson, Colin C. H. Fyffe, Everett Jennings, and Timothy F. Mullen, for appellees.

Mr. Justice Craig delivered the opinion of the court:

This is an appeal by appellant, the Chicago, Milwaukee and St. Paul Railway Company, from a judgment of the circuit court of Sangamon county affirming an order of the Illinois Railroad and Warehouse Commission, entered, after a hearing, on a citation issued by it of its own motion, directed to the appellant, requiring it to show cause for the advancement of certain switching charges or rates in what is known as the Chicago switching district. The order appealed from was entered on April 11, 1913, since which time the Public Utilities act has become effective, by which the Railroad and Warehouse Commission is merged into the State Public Utilities Commission, so that this appeal is now defended by it as the successor of the Illinois Railroad and Warehouse Commission, together with the Chicago Coal Dealers' Association and the Illinois Manufacturers' Association, by whom the complaint was made, as the representatives of the sellers and consumers of coal of North Chicago.

Much of the coal that is shipped into Chicago from the mines by rail comes from the south and east and the railroads carrying such coal enter Chicago from the south. The railroad tracks of appellant enter and leave Chicago

267 – 35

from the north and west. It serves consumers of coal and dealers in that commodity over a large area in the northwest part of the city and suburbs. This coal in car-load lots is transferred from the tracks of the coal carrying roads to the tracks of appellant and by it switched to the various industries and dealers it serves. The switching charges involved are the charges for switching or hauling these cars from the point of delivery on its tracks to the place of ultimate consignment. These switching charges are a part of the entire charge of hauling from the mine to the ultimate consignee and are included or absorbed in the through rate made by the initial carrier to point of destination. When appellant gave notice of raising these switching charges the coal carrying roads immediately gave notice to the consumers and dealers in coal served by the appellant that these through rates would be canceled and there would be a corresponding rise in the through rate. Complaint was made by the dealers to the Railroad and Warehouse Commission against such increase, which complaint was docketed with the commission as No. 2032. When the increase so made on the through rate by the coal carrying roads was inquired into, it was discovered that the only cause of the increase was the advance made in switching charges by the appellant and the necessity of including such charges in the through rate, whereupon the Railroad and Warehouse Commission issued the citation in this case against appellant to show cause for demanding of the coal carrying roads a higher compensation for the terminal services performed by it, and a temporary restraining order was entered prohibiting any change in the rates on coal shipped from points within the State until the matter could be heard by the commission. This citation, which is the case under consideration, was made the subject of a separate proceeding and given docket No. 2033.

The appellant company does not serve any mine in Illinois that sells coal to dealers or consumers in Chicago, and

did not publish in advance through rates and was not made a party to the complaint filed in case No. 2032 before the commission. It, however, seems to have filed or prepared to file an answer in that case, and appeared in response to the citation issued in this case (No. 2033) and obtained leave to have its answer so prepared in case No. 2032 stand as its answer in this case. The substance of the defense interposed by the answer was, that appellant is a common carrier organized under the laws of the State of Wisconsin, engaged in intra-State and inter-State commerce, and operating approximately 9000 miles of main railroad tracks, exclusive of double-tracking, yards, spurs and sidings, with extensive terminal facilities in the city of Chicago for the accommodation and expedition of the traffic over its own lines; that during the years prior to August 1, 1911, it voluntarily agreed with the other railroads entering the city of Chicago on a through tariff rate on car-load lots of coal covering transportation from the mines in Illinois to points of delivery on its lines in Chicago, by which it received a division of approximately four dollars per car, plus ten cents per ton for all over 60,000 pounds to the car on each car of coal handled over its lines; that in October, 1912, it notified the connecting lines that such division of rates was unsatisfactory and insufficient to compensate it for the services rendered, and that it had adopted a tariff of twenty cents a ton on all coal received in car-load lots from the connecting railroads mentioned in the petition in case No. 2032 for delivery over its lines to stations in what is known as the inner zone of the Chicago district. The answer further alleges that for a number of years there has been in force a tariff schedule for hauling coal in car-load lots within the city of Chicago and in its immediate vicinity known as the Illinois distance tariff, established by the commission, which provides a rate on car-load lots of soft coal of twenty-three cents per ton where the hauling distance is two miles or under, with a graduated scale up

to fifty-eight cents per ton where the hauling distance is not less than twenty-five miles nor more than thirty miles; that the actual cost of handling cars of coal from connecting lines to the points of delivery on its line within the city of Chicago is approximately $10 per car; that the appellant is not a coal carrying road and gets no line haul on such commodity, but is required to pay a charge of forty-five cents per day for each day a car of any other line is in its possession in making such delivery, and that it requires on an average seven days for the delivery of each car; that requiring it to give the coal carrying railroads and the consumer the benefit of its terminal connections will interfere with the line hauls over its own lines and require it to pay a per diem charge for the transportation of coal cars on its terminals without receiving a reciprocal per diem charge from other railroads, for the reason that it does not perform a similar service for the other railroads entering the city of Chicago, as it makes no long haul of coal that would be subject to such deliveries, and that requiring it to transport intra-State car-load lots of coal at such lower rate will have the effect of placing a burden on inter-State commerce, in violation of section 8 of article 1 of the constitution of the United States and the provisions of the act commonly known as the Inter-State Commerce act, and also require the appellant to transport coal over its lines for a less rate, for equal weights and distances, than is charged elsewhere in Illinois, and, in effect, will cause it to discriminate against other commodities and the shippers of other commodities elsewhere and place a burden upon other commerce not so preferentially benefited. The answer further alleges that requiring it to transport coal in car-load lots for the benefit of connecting carriers to points of delivery on its own terminals is a violation of its constitutional rights and of section 26 of the Illinois Railroad and Warehouse Commission act, which prescribes the powers and duties of the Railroad and Warehouse Commission,

which, it alleges, is without power or authority to make the order heretofore entered in the cause on December 12, 1912, (the temporary restraining order,) requiring appellant to receive from connecting lines of railways at its Chicago terminals, coal in car-load lots and deliver the same to points on its system at no higher rate than it had heretofore been making for such service, and asks that the restraining order entered in the cause may be set aside and rescinded and the proceedings against it dismissed.

A hearing was had before the commission, at which appellant and the coal dealers' association and parties interested appeared. Evidence was taken, from which evidence, and from other facts found by the commission from the previous proceedings before it bearing on the subject and to which no objection has been made as a basis for the ultimate finding of the commission, it appears that some time prior to September 16, 1908, the Railroad and Warehouse Commission, after a hearing lasting several months, issued an order, known as "Rule 23," fixing the Chicago switching district and the rates for the different kinds of switching within that district. It seems that immediately prior to the adoption of this rule appellant had been demanding twenty cents per ton for its services in making delivery of coal in car-load lots received from other roads to the various industries on its lines within the Chicago district and that the other railroads had refused to accede to such demands. Before this rule became effective appellant and other railroad companies obtained a temporary injunction from the Federal court restraining the enforcement of such rule. While this injunction suit was pending, representatives of the various railroads entering Chicago and a committee representing the shipping and manufacturing interests of the city opened negotiations with a view of adjusting, by agreement of all the parties interested, the switching rates in Chicago. Numerous conferences were held between them, at some of which representatives of

the Illinois Railroad and Warehouse Commission and the Inter-State Commerce Commission were present. These conferences covered a period of nearly two years, and they finally resulted in an agreement that the Chicago rate should apply to all car-load traffic to and from all industries in the Chicago switching district, the line bringing into or taking the traffic out of said district, where the freight charge was $15 or more per car, to absorb,—that is, pay,—the connecting line switching charge, which was fixed at not to exceed one cent per one hundred pounds, except upon grain, coal and coke. The reason the exception was made as to coal was, that for a period of twenty or thirty years the switching charges on coal had been established at approximately four dollars per car, plus ten cents per ton for all over 60,000 pounds to the car. This agreement was embodied in what was called the Lowery tariff, covering the switching or terminal charges for Chicago, and was accepted and permitted to be published and become effective by both the Illinois Railroad and Warehouse Commission and the Inter-State Commerce Commission. After these rates had been agreed to, except as to the coal hauling roads, the Chicago, Milwaukee and St. Paul Railway Company and the Chicago and Northwestern Railway Company, who were parties to the agreement, served notice upon the coal carrying roads that under the reciprocal switching tariffs then about to go into effect they would demand for coal and coke from connecting lines twenty cents per ton. Immediately upon receiving such notice the coal carrying roads and coal operators protested to the Inter-State Commerce Commission and to the Illinois Railroad and Warehouse Commission against the acceptance of the Lowery tariff until the matter of the division of switching charges on coal and coke was settled. In July, 1911, during the hearings before the commission and before chief examiner Brown of the Inter-State Commerce Commission, divisions on coal and coke were adjusted between the Illinois coal

carrying roads and the Chicago, Milwaukee and St. Paul
Railway Company, and that carrier receded from its de-
mand for a division of twenty cents per ton and agreed to
the acceptance of a division of four dollars per car, with
an additional charge of ten cents per ton on any excess
over 60,000 pounds.  The rates thus established were ac-
cepted and acted upon by all of the railroads entering Chi-
cago, including the appellant, from August 1, 1911.   In
October, 1912, appellant served notice on the coal carrying
roads that it would no longer accept the rate of four dollars
per car, plus the ten cents per ton on all over 60,000 pounds
to the car, as its portion of the through rate charges from
mines in Illinois to the points of delivery on its lines with-
in the Chicago switching district but would demand as its
portion of such rate the sum of twenty cents per ton, which
resulted in the complaints filed in case No. 2032 before
the commission and the issuance by the commission of the
citation in the present case.   At the hearing appellant in-
troduced evidence tending to show that the switching rate
on coal as established by the Lowery tariff was unreason-
able and insufficient to cover the expense of such service,
the evidence offered on this subject, however, consisting
very largely of that which had been prepared for use in
the injunction proceeding instituted in 1908 and relating to
the conditions existing at that time, while the evidence in-
troduced by the appellees showed the prior controversy be-
tween the several railroads resulting in the establishment
of rule 23 by the commission, followed by the negotiations
and conferences between the parties interested, the Illinois
Railroad and Warehouse Commission and the Inter-State
Commerce Commission, culminating in the agreement ac-
cepting and adopting the Lowery tariff for the Chicago
switching district and the suspension of rule 23 while that
tariff was in force.   As it clearly appeared that the Lowery
tariff was based on a reciprocal arrangement of the switch-
ing charges among the several railroads involved and that

appellant assented to and adopted the provisions of such tariff with full knowledge of all of the matters complained of, the commission deemed the evidence offered insufficient to warrant it in setting aside and annulling the traffic arrangements established by the Lowery tariff, and entered its order finding, in substance, that the Lowery tariff was adopted by the several railroads which enter the Chicago switching district as a reciprocal arrangement made after many conferences between the shippers and other organizations interested in transportation arrangements in the city of Chicago; that it went into operation by general consent of all parties interested but without the formal approval of the commission, and that the rates therein established were to take the place, for the time being, of the rates established by rule 23, and were to remain in force and effect until the commission determined otherwise or was given an opportunity to take steps to re-establish rule 23 if in its judgment it so desired; that to permit a change to be made in the rates fixed by the Lowery tariff would, under existing circumstances, practically be an abandonment of rule 23; that the amount to be received by appellant out of the entire charge should, under the law, in the first instance, if possible, be agreed upon between it and the other railroads after the through rate is established, and if this could not be done, that the commission had the power to hear and determine the question between the respective railroads interested, and that as there was nothing in the record to show any attempt had ever been made by the railroads which were parties to the through rate to agree upon such an amount, nor that the matter of the division of through rates had been presented to the commission for investigation or determination, it ordered and directed "that the charge provided for in the through rates which were adopted and have been in force between the respective parties since August 1, 1911, shall be continued and remain in full force and effect until the further order of this com-

mission, and the divisions of such through rates at that time agreed upon between the respective parties, and which have been acted upon from such date, shall remain as agreed upon between the respective parties at the time of the adoption by them of the Lowery tariff until such a time as they may be changed by agreement or in the manner herein stated." From this order appellant appealed to the circuit court of Sangamon county, which affirmed the order of the commission, and this appeal was then taken.

Appellant points out that the order of the Railroad and Warehouse Commission complained of consists of two essential and independent parts, as follows: First, an order that through rates effective August 1, 1911, from coal producing points in Illinois to destinations in Chicago, be continued in force and effect "until the further order of this commission;" and second, that the division of such through rates which each participating carrier may have shall remain the same as it was on August 1, 1911, until such time as the railroads interested may agree on a different division, or the commission, in the absence of such agreement, order a different division.

Nine points are relied upon by appellant for reversal, of which the first, second, third, fourth, fifth and eighth are to the effect that the Illinois Railroad and Warehouse Commission was without jurisdiction over the subject matter covered by its order; that it had no authority to enter an order regulating transportation charges of the appellant road, and its division of such charges with connecting lines, in a proceeding which involved only a citation directed against appellant, alone; that it did not have jurisdiction over the persons of the various railway companies other than appellant who were affected and whose tariff charges were affected and reduced by the order appealed from; that such other railroad companies were not notified and their rights were to be passed upon and they were not given an opportunity to be heard, and the order entered is there-

fore contrary to the provisions of the statute of Illinois which prescribes the powers and duties of the Railroad and Warehouse Commission, and the order was in excess of its authority and beyond its jurisdiction. The other points are, that the order appealed from is unreasonable and unlawful, and if given force would have the effect of taking the property of the appellant and other railway companies affected thereby without due process of law, contrary to the constitutions of the State of Illinois and the United States, and that for these reasons the circuit court of Sangamon county erred in sustaining and affirming the order of said commission on appeal.

In support of its first series of contentions the appellant cites section 31 of the Railroad and Warehouse act, (Hurd's Stat. 1911, p. 1855,) which provides that "the commission are hereby empowered and authorized to hear and determine all questions arising under this act, upon giving due notice to all persons, individuals or corporations interested therein, and to enter an order in relation thereto," and the cases of *Payson* v. *People*, 175 Ill. 267, *Schertz* v. *People*, 105 id. 27, *Fortman* v. *Ruggles*, 58 id. 207, *McChesney* v. *People*, 148 id. 221, *Senichka* v. *Lowe*, 74 id. 274, and *Cobe* v. *Guyer*, 237 id. 516, which hold that where a body is created by statute with special powers nothing will be presumed to be within its jurisdiction which does not distinctly appear to be so, and that when such body assumes to act upon a particular matter its jurisdiction of both the person and the subject matter must affirmatively appear from its records. However true this may be as an abstract proposition of law, such rule has no application to the case at bar. Appellant cannot be heard to urge an alleged error in the proceedings which in no way injuriously affects its rights. (*Short* v. *Raub*, 81 Ill. 509; *Reed* v. *Boyd*, 84 id. 66; *City of Chicago* v. *Gilsdorff*, 258 id. 212.) This rule applies to statutory as well as other proceedings. Thus, in *O'Laughlin* v. *Covell*, 222 Ill. 162, (a proceeding

to register title under the Torrens act,) we held that even if it be admitted the service on necessary parties to the proceedings was defective and insufficient, such error could not be urged by the other party as a ground for reversal in this court. The same is true here, where the record shows that the other railroads not only knew of this proceeding but also were instrumental in bringing it about, and have accepted and acted upon the benefits of such order by establishing through rates based on the tariff established by it, and in other ways expressed their intention to be bound by the ruling of the commission in that respect.

It is also contended, in this connection, that the order is void for the reason that there is no finding in it that the railroads interested have refused or neglected to voluntarily establish the through rates, and that the commission finds that such through rates are necessary for the accommodation of the public and will not give to one carrier an unfair or unequal advantage over another, as provided in section 27 of the act. This contention is based upon that portion of the findings of the commission in which it states "that there is nothing in this record to show that any attempt has ever been made by the common carriers which were parties to the through rate to agree upon any amount, nor has the matter of division been presented to this commission for investigation or determination." Appellant's argument is that a finding of such facts in the order is jurisdictional, and that unless the order so finds, any order of the commission establishing a through rate is illegal and void. Assuming, without deciding, that this is true, such question is not presented for decision on this record. The order of the commission did not establish or attempt to establish a new through rate, but, on the contrary, only continued in force the through rate that was previously established by agreement among the parties in lieu of the provision of rule 23 of the commission, which was suspended while the switching rate established by the

Lowery tariff continued in force. The only effect of the order entered was to continue in effect the through rate established by the Lowery tariff until such time as that tariff or rate should be changed by agreement of the parties or by a hearing before the commission in the manner provided by that act. Where no new rate is established or attempted to be established it is unnecessary that the order continuing the old rate in force should contain a finding that the railroads interested had refused or neglected to voluntarily establish a new through rate, or that the establishment of a new through rate was necessary for the accommodation of the public and in order not to give one carrier an unfair or unequal advantage over another. At most, those provisions of the statute were intended to be applicable to the proceedings in which new rates were established. As nothing of that kind was done in this case a recital of such finding in the order was unnecessary.

It is a sufficient answer to this portion of appellant's contention, that the coal carrying roads are making no objection to the order in question, and it does not lie in the mouth of appellant to make objections which these other roads might make. It is further apparent that the other roads are in no way interested or affected by the order of the commission for this reason: the other roads of whose interests appellant is so solicitous, by raising their through rates would neither gain nor lose under the circumstances. These roads, as we have seen, made a through rate on carload lots of coal from the mines to points within the Chicago switching district. The switching charges which were agreed to as a result of the reciprocal arrangement were four dollars per car in car-load lots weighing 60,000 pounds and less, and ten cents per ton on all car-load weights over 60,000 pounds, which portion of the through rate went to appellant where such cars were delivered to consumers and dealers served by appellant. The coal hauling roads or initial carriers received the balance. When appellant gave

notice of raising its rates to twenty cents a ton, the initial carriers, in order to maintain the through rate fixed under the Lowery tariff, would be obliged to take less than what they had been receiving, and to get the same amount as they had been receiving under the Lowery tariff they were compelled to raise the through rate by an amount equal to the additional switching charges proposed by the appellant. The latter course was the one adopted, which, as we have seen, led to the complaint by the coal dealers' association being filed with the commission, docketed as No. 2032. It sufficiently appears that when an inquiry was begun into this matter the only reason for the increase in the through rates was the advance in switching charges made by appellant. The other roads were apparently satisfied with the rates according to the Lowery tariff and were entirely willing to let them remain. In brief, the whole matter is similar to a case in which the interests of several parties are involved, which has been settled by stipulation and agreement of all the parties and the court has ordered accordingly. One of the parties to this stipulation and agreement attempts to break it and the court by its order restrains such action of the dissatisfied party, and thereby merely restores the *status quo* of all parties under the stipulation, of which they were all cognizant and had agreed to.

As to the second series of objections, it is insisted that in restoring the Lowery tariff the commission, in effect, turned over the appellant's tracks and terminal facilities to other railroads engaged in a like business, contrary to the provision of section 26 of the Railroad and Warehouse act, and deprived appellant of its property without due process of law, in violation of the provisions of the State and Federal constitutions. Similar contentions were made and passed upon by the Supreme Court of the United States in *Grand Trunk Railway Co.* v. *Michigan Railroad Commission,* 231 U. S. 457, and determined adversely to the contention now made by the appellant. The Michigan statute

contained provisions similar to those found in section 26 of the act under consideration, with a provision that nothing in the act should be construed as requiring any railroad to give the use of its tracks or terminal facilities to another railroad engaged in a like business. The Michigan railroad commission undertook to compel the railroad companies entering Detroit to receive cars from one another at a junction point or physical connection within the corporate limits of the city and transport them to the team-tracks on the lines of the other companies, and fixed the switching charges for such service. It was there contended that the team-track service was not, in a proper sense, transportation but a mere convenience at the destination or initial point of the transportation, and hence terminal facilities, merely, and their use was not required to be given to other railroads engaged in like business under the exemption clause in the Michigan statute, and, if they were exempted by such provision, that such order by the commission requiring the rendering of such terminal service was a taking of their property without due process of law, in violation of their constitutional rights. In that case the court pointed out that the extent of Detroit was about twenty-two miles, with a population of about 500,000, and that such team-tracks were necessary to prevent the congestion which would result from requiring all car-load freight, both in and out of the city, to be delivered at the freight depots, and hence were in a proper sense shipping stations; that to require local transportation by a railroad between its own shipping stations in a city, whether the number of shipping stations had been voluntarily established by the railroad or by the order of the commission under its powers, provided such transportation is for a substantial distance and of such a character as reasonably to require a railroad haul as distinguished from other means of carriage, was a legitimate exercise of the commission's power. It was there said: "It is also clear that a statute validly

may, and that statutes we are considering do, authorize the employment of such depôts, side-tracks and team-tracks of a railroad for transporting car-load freight to or from the junction of such road with another road as a substantial part of a continuous transportation routing where such junction is outside the city limits.  *  *  *  The fact that the freight movement begins and ends within the limits of a city does not take from it its character of an actual transportation between two termini, the other conditions obtaining.  *  *  *  The effect of the order is simply that the companies shall accept freight at the designated points for shipment to the other designated points.  This, except in an extreme sense, is not a use of the tracks and terminals, or, rather, it is only a proper use,—the use for which the roads were constituted to afford.  An area of twenty-two miles is attempted by appellants to be localized and made a destination point.  A city may, in a sense, be such a terminal unit, but considering the extent of Detroit it is competent, we think, for the State, under the conditions which this record presents, to consider points within it the beginning and destination of traffic; and to call the service necessary to such intra-State movement of freight a taking of terminals is misleading, and puts out of view the full signification of the question which the record presents, which is, Is there a distinct and sufficient movement between the places which the companies can be required to perform, or which, to put it another way, constitutes transportation, and therefore such as the companies were created to perform?  That cars may be delivered or received is but an incident.  The statute, therefore, is a regulation of the business of appellants,—not an appropriation of their terminal facilities for the use and benefit of other roads.  It is therefore justified by the doctrine of *Wisconsin, M. & P. Railroad Co.* v. *Jacobson,* 179 U. S. 287; 45 L. ed. 194; 21 Sup. Ct. Rep. 115.  See, also, *Minneapolis and St. Louis*

*Railroad Co.* v. *Minnesota,* 186 U. S. 257; 46 L. ed. 1151; 22 Sup. Ct. Rep. 900."

The case of *Louisville and Nashville Railway Co.* v. *Central Stock Yard Co.* 212 U. S. 132, and the other cases cited by appellant, are not in conflict with this view. The former case is fully discussed in *Grand Trunk Railway Co.* v. *Michigan Railroad Commission, supra,* and will not, therefore, require further discussion here.

The views herein expressed as to the right of the legislature to regulate and control the side-tracks, spurs and industrial connections of intra-State railroads are in full accord with the previous decisions of this court. Thus, in *Chicago Dock Co.* v. *Garrity,* 115 Ill. 155, we held that side-tracks, spurs and industrial connections, whether constructed by the railroad or by private individuals and connected with the railroad lines, were in legal contemplation and to all intents and purposes a part of such railroad line with which they were connected, and when thrown open to public use, indiscriminately, became impressed by such public use with a public character and subject to public regulation and control. And in *Railroad and Warehouse Commission* v. *Vandalia Railroad Co.* 258 Ill. 397, we held that a railroad company, in switching cars within the city's limits between industries on its lines or to make connections for delivery to industries on other lines, acts as a common carrier, the same as when engaged in moving cars between stations on its own lines, and is subject to the jurisdiction of the commission in the matter of the regulation of its rates and charges for such service. And such is the trend of all of the cases upon the question. It may be added, however, that there is a marked distinction between the turning over of the use of the tracks and terminal facilities of one railroad to another and the regulating of the switching charges for services rendered by the operating railroad. One would permit a railroad to operate its trains and cars over and upon the tracks and into the terminals of the

other, while the other would only fix the charges which might be made by the operating railroad for such services in receiving and transporting cars or freight of the other railroad from connecting points to place of destination over its lines without giving any right to the other railroad to enter upon its tracks or into its terminals at all.   Such is the situation here.

It is further insisted that the rate established by the Lowery tariff is unreasonable and for that reason the order should be reversed.   We would be inclined to inquire into the subject matter of this contention if it were properly presented and we could do so understandingly, which we cannot do in the present state of the record.   The rates which were kept in force by the order of the Railroad and Warehouse Commission were, as we have pointed out, the result of a reciprocal agreement among the different railroads and appellant and those who pay the freight from which the railroads derive their profits.   It would be impossible to do justice in the matter without going into the whole subject and considering the rights and interests of all the parties.   While the coal carrying roads are interested in having appellant deliver coal to the users of that commodity located along appellant's lines in that part of the Chicago switching district covered by it, there can be no doubt that appellant is equally interested in having the coal carrying roads perform the same service as to the car-load lots of grain and other commodities which it brings to Chicago over its tracks from the immense territory which it serves and switching these cars to points within the switching district which are served by the coal carrying roads.   As to how the latter roads fared in this arrangement we are not fully advised from the record, but it is plain that the object of the Lowery tariff was apparently to make an adjustment of rates satisfactory to all shippers, wherever situated within the Chicago district, and we must assume that the appellant company had good reasons for agreeing

267 – 36

to those rates, and while its contention may be true that it is switching coal cars under the present arrangement at a loss, it may well be true that the other railroads are switching appellant's cars at an equal loss, by reason of which fact the appellant receives larger profits on through freight for which it is the initial carrier. The Lowery tariff was a reciprocal switching rate or charge established by agreement between all the parties interested, including appellant, only after the most deliberate and careful investigation, involving conferences lasting many months and a consideration of conditions by experts of great knowledge and experience in such matters, and before it is set aside or overturned, all interested parties should be given notice of the hearing and a chance to present their side of the case. No attempt was made to do that in this case. Appellant knew then, as well as it knows now, that if any change was to be made in the switching rates established by the Lowery tariff all other railroads having switching connections with it would be affected by such change in rates and were necessary parties to the proceedings. Appellant did not ask to have them made parties, but proceeded with the hearing to its final adjudication without complaint. Under these circumstances we think appellant is in no position to urge that the commission erred in not entering an order affecting the rights of the parties over which it at the time had no jurisdiction, and one which, on the record before it, it had no lawful authority to make. It would be manifestly unfair to do so. It is further to be observed that most of the evidence introduced by appellant related to a time prior to the adoption of the Lowery tariff. This tariff the appellant accepted without objection, with full knowledge of substantially all of the facts which it now urges against the tariff as making the same unreasonable and oppressive. If such is true, it is a condition brought about by appellant's active co-operation and approval. If it seeks relief from it, it should institute the

kind of a proceeding contemplated by the statute. Until this is done neither the courts nor the commission can afford it any relief. When that is done it will be time enough to consider that question. For the present it is sufficient to say the matter of rate regulation is essentially one of legislative control, and that when such regulation has been made it will be only reviewed by the courts in so far as it is necessary to determine whether or not the rate established is so unreasonable and unjust as to work a practical destruction of property rights or amount to a confiscation of the property. (*Inter-State Commerce Commission* v. *Union Pacific Railroad Co.* 222 U. S. 541; *Regan* v. *Farmers, etc.* 154 id. 362; *Chicago, Rock Island and Pacific Railway Co.* v. *State Railway Commission,* 85 Neb. 618; *State* v. *Public Service Commission,* 137 Pac. Rep. 132; *People* v. *Railroad Co.* 53 App. Div. (N. Y.) 61; *Lehigh Valley Railroad Co.* v. *United States,* 204 Fed. Rep. 986.) In this State the statute has confided the matter of rate regulation to the Railroad and Warehouse Commission, with ample power to investigate and decide such matters. The Railroad and Warehouse Commission has the power to fix reasonable rates and charges between points wholly within the State and to determine the matters involved in this suit. (*Railroad and Warehouse Commission* v. *Vandalia Railroad Co. supra.*) Such regulation does not interfere with inter-State commerce. *Minnesota Rate cases,* 230 U. S. 352.

We think that the evidence in this record falls far short of showing that the rate established is so unreasonable or unjust as to amount to a confiscation or deprivation of appellant's property or call for judicial interference.

For the reasons given, the judgment of the circuit court of Sangamon county will be affirmed.

*Judgment affirmed.*