# GRAND TRUNK RAILWAY COMPANY *v.* MICH-IGAN RAILROAD COMMISSION.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 382.   Argued October 23, 24, 1913.—Decided December 8, 1913.

A State is competent to create a commission and give it power of regulating railroads and investigating conditions upon which regulation may be directed; and the judiciary will only interfere with such a commission when it appears that it has clearly transcended its powers.

Courts are reluctant to interfere with the laws of a State or with the tribunals constituted to enforce them; doubts will not be resolved against the law.

It cannot as yet be asserted that Congress has, to the exclusion of the States, taken over the whole subject of carriers' terminals, switchings and sidings; and *quære* where the accommodation between intrastate and interstate commerce shall be made.

The fact that a movement of freight begins and ends within the limits of a city does not take from it its character of an actual transportation between two termini; and so *held* in regard to transportation between junction points in Detroit, Michigan.

While a city may be in some senses a terminal unit, the State Railroad Commission may regulate traffic between different points therein as transportation, and to do so does not amount to an appropriation of the terminals of one road for the use and benefit of other roads.

Transportation is the business of railroads and when, and to what extent, that business may be regulated so depends upon circumstances that

no inflexible rule can be laid down. *Wisconsin &c. R. R. Co.* v. *Jacobson,* 179 U. S. 287.

If the provisions for penalties in a statute creating a railroad commission and providing for the enforcement of the orders made by it are separable, as in this case, their constitutionality can be determined when their enforcement is attempted, and the operation of the whole act will not be suspended before that event. *Louis. & Nash. R. R. Co.* v. *Garrett, ante,* p. 298.

Railroad companies are incorporated for purposes of transportation; and the fact that a company was not specifically incorporated to carry on intra-city transportation cannot prevail against the power of the State to regulate it in regard to legitimate elements of transportation within the city.

An order of the Michigan Railroad Commission requiring certain railroads doing an interstate business to use their tracks within the city limits of Detroit for the interchange of intrastate traffic, sustained as being within the regulating power of the commission; and also *held* that such order was not unconstitutional as interfering with interstate commerce or as depriving the carriers of their property without due process of law.

198 Fed. Rep. 1009, affirmed.


The facts, which involve the validity of an order of the Michigan Railroad Commission relative to intrastate transportation and switch connections in the city of Detroit, are stated in the opinion.

*Mr. George W. Kretzinger, Jr.,* with whom *Mr. G. W. Kretzinger* and *Mr. Aldis B. Browne* were on the brief, for appellants.

*Mr. Hal H. Smith,* with whom *Mr. Grant Fellows,* Attorney General of the State of Michigan, was on the brief, for appellees.

Mr. Justice McKenna delivered the opinion of the court.

Appeal from a decree of the District Court, three judges sitting, denying a motion of appellants for interlocutory

injunction against an order of the Michigan Railroad Commission and the denial of a motion of appellants for the continuance of a restraining order theretofore entered in the case.

The Commission was constituted by the Public Acts of the State and invested with quite full and detailed powers of regulation of the railroads of the State.   Act No. 300 of the Public Acts of Michigan of 1909, as amended by Act No. 139, 1911.

Section 7 as originally enacted and as amended is alone specially relevant to the discussion and is inserted in the margin, subdivision (d) being the amendment.[1]

---

[1] (55) SEC. 7.  (a)  All railroads, subject to the provisions of this act, shall afford all reasonable and proper facilities by the establishment of switch connections between one another and the establishment of depots and otherwise for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith, and shall transfer and deliver without unreasonable delay or discrimination any freight or cars or passengers destined to any point on its own line or on any connecting line, and shall not discriminate in their rates and charges between such connecting lines: *Provided,* precedence may be given to live stock and perishable property.   Nothing in this act shall be construed as requiring any railroad to give the use of its tracks or terminal facilities to another railroad engaged in like business.   Any person or any officer or agent of any corporation or company who shall deliver property for transportation to any common carrier subject to the provisions of this act shall have the right and privilege of routing such shipments and of prescribing and directing over what connecting line property so shipped shall be transported, and it shall be the duty of the initial carrier to observe the direction of such person or such officer or agent of any corporation or company, and to cause such freight to be transported over such connecting line as may be directed and required by such shipper.

(57) (c) Every corporation owning a railroad in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation or individual having connecting tracks; *Provided,* such cars are of the proper gauge, are in good running order and equipped as required by law and otherwise

After the amendment took effect, and on July 29, 1911, the Grand Trunk System, which is constituted of a number of railroad lines, published a tariff of charges, to be effective September 1, 1911, which, among other things, set forth the rates for the designated services within the corporate limits of the City of Detroit and as to team track services as follows:

"In case team track deliveries are required for the unloading of shipments received from other carriers, or when

---

safe for transportation and properly loaded; *Provided further*, if the corporations cannot agree upon the times at which the cars shall be drawn, or the compensation to be paid, the said commission shall, upon petition of either party and notice to the other, after hearing the parties interested, determine the rate of compensation and fix such other periods, having reference to the convenience and interests of the corporation or corporations and the public to be accommodated thereby, and the award of the commission shall be binding upon the respective corporations interested therein until the same shall have been revised.

(57a) (d) Every common carrier operating within this state shall receive and transport at reasonable rates any and all carload traffic offered for transportation under the usual conditions locally consigned between points in the same city or town and shall receive and transport at reasonable rates from any junction point or transfer point or intersection with another railroad in such city or town any and all such carload freight destined to team tracks or other sidings on any line operated by the delivering carrier, and shall deliver such car or cars upon such team tracks or sidings in the city or town where such car or cars are received from such connecting line when required so to do: *Provided*, that when delivery is requested which will involve the use of a private siding not owned or controlled by consignee, said consignee shall file with both receiving and delivering carriers written permission signed by the owner or lessee of such private siding authorizing the use of same. When the particular delivery desired cannot be accomplished owing to the congestion of cars upon such siding or team tracks, it shall be the duty of the delivering carrier to notify consignee of such conditions and it shall be the duty of such consignee upon receipt of such notice to advise upon what other siding delivery will be accepted or whether or not it is desired that such car or cars shall be held awaiting the opportunity for delivery upon the siding originally designated as the destination.

such team tracks are used for the loading of shipments for delivery to other carriers, three dollars per car in excess of the charge made for switching to or from industrial sidings will be assessed."

This tariff also provided a charge of $5.00 for switching to and from industrial sidings and a charge of $8.00 for team track delivery from junction points with other roads within the switching limits of Detroit.

A complaint was made by one John S. Haggerty to the Commission of this difference as discriminatory. Haggerty, it is said in one of the briefs, conducts a brick-making plant, having a siding on one of the railroads in Detroit, and to supply his trade ships carloads of freight over various railroad lines doing business in the city, among which are the lines of the Grand Trunk System.

An answer was filed to the complaint by the Grand Trunk Western Railway Company. After hearing, the Commission held that the difference in rates was discriminatory and the railway company was ordered to file a tariff removing the discrimination, that is, the discrimination between the charges for industrial switching and for switching between junction points and team tracks; and to publish and make effective "like charges for the movement of a carload shipment received from an industry within the City of Detroit, upon the said Grand Trunk Western Railway, consigned for delivery upon a team track or other siding of said road within the same city, and for a like shipment received by said Grand Trunk Western Railway from a connecting carrier at a junction point within the corporate limits of the city of Detroit, consigned to a team track or other siding upon said road within the same city."

Subsequently to the making of such order the Grand Trunk System published a new tariff to be effective March 16, 1912, naming a rate of $5.00 between industrial tracks and a like rate between junction points with con-

necting carriers, within the switching district of Detroit, and industrial tracks within the said limits; $8.00 between junction points with other railroad companies, within said limits, and team tracks within said limits; and $8.00 between team tracks on the railway's' own lines. The tariff was duly filed with the Commission and with the Interstate Commerce Commission.

Haggerty filed a supplementary petition with the Commission complaining that the new rates were unreasonable and exorbitant, and, on March 15, 1912, the Commission ordered the postponement of the same until April 29 to give the Commission an opportunity for investigation into "the reasonableness of such proposed rate and the matter set forth in the complaint." Thereupon the Grand Trunk System issued a supplement to its tariff suspending the intrastate rates named in its tariff, and, on March 30, published a new tariff canceling all rates between industries having private sidings on the System and hold or team tracks on that System, and all rates between junction points with other carriers within the corporate limits of Detroit and the team tracks of the System. The effect of this tariff was to withdraw all intrastate and interstate switching movements, except as to the Detroit & Toledo Shore Line, with which the Grand Trunk was under contract for terminal switching.

On April 10 the Commission suspended this supplemental tariff in order to give it opportunity to investigate, and two days afterward the bill in this case was filed. On April 27 an amended bill was filed, and, on the same day, the Detroit, Grand Haven & Milwaukee Railway Company filed its bill.

We may observe that the order of the Commission of April 10 is the only one in controversy. The other orders of February 6 and March 15, 1912, were directed against the Grand Trunk Western Railway, and when it came to the knowledge of the Commission that

that road did not enter the city, the orders were canceled.

The bills prayed that the acts referred to and the order of the Commission be declared null and void as to complainants, that injunctions interlocutory and perpetual be granted restraining appellees from executing the order, and from taking any steps or proceedings to enforce any of the penalties or remedies of the statute.

Answers were filed to the bills, and supporting and attacking affidavits. The District Court upon hearing denied an injunction and vacated the restraining order, but suspended the formal entry of its orders. Subsequently the cases were consolidated for the purposes of an appeal, and an appeal allowed. The bond was fixed at $100,000 and the restraining orders continued in force pending the appeal.

The two suits may be treated as one, the material points being identical, except as to the territory through which the roads run and the diversity of citizenship which exists only in the first suit filed. The foundation of both suits is the same, that the order of the Commission and the acts of the State under which it was made, in so far as the order and the acts require of complainants or their property any of the services above set forth or so threatened to be required, constitute the taking of their property without due process of law in contravention of the Fourteenth Amendment to the Constitution of the United States; and is also a violation of the commerce clause of that instrument. The specification under the latter is "that Congress has taken over the whole subject matter of terminals, team tracks, switching tracks, sidings, etc., of carriers engaged in interstate commerce, and has enacted that such carriers shall not be required to give the use of such terminal facilities to other carriers engaged in like business."

It is further objected against said order that the com-

panies were not incorporated for the purpose of local or intrastate switching or drayage business, but for the purpose of interstate and intrastate commerce; and, further, the penalties prescribed by the acts under which the Commission purported to have acted are so drastic that a resort to court to test the validity thereof is at the risk of imprisonment in the jails of the various counties where the lines of the companies run, and, therefore, the companies are denied the equal protection of the laws and their property is taken without due process of law.

The question in the case is whether, under the statutes of the State of Michigan, appellants can be compelled to use the tracks it owns and operates in the city of Detroit for the interchange of intrastate traffic; or, stating the question more specifically, whether the companies shall receive cars from another carrier at a junction point or physical connection with such carrier within the corporate limits of Detroit for transportation to the team tracks of the companies; and whether the companies shall allow the use of their team tracks for cars to be hauled from their team tracks to a junction point or physical connection with another carrier within such limits and be required to haul such cars in either of the above-named movements or between industrial sidings.

It is contended that the order is an interference with interstate commerce. The contention is premature, if not without foundation. Section 7, before its amendment, required all railroads subject to it to establish switching connections between one another and to establish depots, and otherwise, for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of property and passengers to and from their several lines and those connecting therewith, and also for the transfer and delivery of cars without unreasonable delay or discrimination to any point on their own lines or on any connecting line, and forbidding discrimina-

tion in rates and charges.  And the respective companies were required to draw over their roads the merchandise and cars of any other corporation or individual having connecting tracks when the cars are of proper gauge, equipment, and properly loaded.  Power was given to the Commission, if the compensation could not be agreed on by the roads, to fix such compensation.  In other words, the duty of investigation was imposed on the Commission and the duty to render such judgment as was suitable to the situation and to award compensation to the carriers for any service required of them.

We have seen from the statement of facts that the first concern of the Grand Trunk was the right to charge what it pleased or discriminate between the services.  Inconvenience to its interstate business seems to be an after thought.  Besides, the fact of inconvenience is disputed. It is charged, it is true, in an affidavit filed by appellants; but there was a counter affidavit, and it was averred that the interchange of traffic required by the legislature of the State did not impede interstate business, but on the contrary facilitated it and intrastate commerce and relieved, not caused, congestion on the tracks of the various railroads in the city.  And, as we have seen, the order of the Commission was suspensory only of the tariff of the appellants, not a final determination against it or of the conditions which might or might not justify it.  It is too late in the day to question the competency of a State to create a commission and to give it the power of regulating railroads and necessarily of investigating the conditions upon which regulation may be directed.  If a judicial interference is sought with the exercise of such power it must be clearly shown to have been transcended, not left as a conclusion from the balancing of conflicting affidavits, or even, it may be, as held by the District Court, on *ex parte* affidavits.  Courts are reluctant to interfere with the laws of a State or with the tribunals constituted

to enforce them.   Doubts will not be resolved against the law, nor the decision of its tribunals prevented or anticipated unless the necessity for either be demonstrated. Upon these principles the District Court acted, and rightly acted.

We will not dwell on the contention of appellants that Congress has taken over the whole subject of terminals, team tracks, switching tracks, sidings, etc.   We need make no other comment than that it cannot be asserted as a matter of law that Congress has done so; and where the accommodation between intrastate and interstate commerce shall be made we are not called upon to say on this record.

Before proceeding to the more important contention of appellants, that is, movement between junction points and other points, it is well to observe that a distinction is alleged to exist between team tracks and industrial sidings or tracks.   The allegation (which is neither admitted nor denied in the answer) is that the lands upon which the latter are located are held, owned, or were acquired for the purpose of accommodating the tracks without expense to appellants, either in the acquisition or maintenance of the lands or tracks.   Appellants, it is urged further, are not responsible for cars placed on such tracks nor are appellants required to police them.   Team tracks are laid upon the ground acquired by appellants and were constructed and are maintained by them.   The latter, therefore, are distinctly accessories or facilities in the receipt and delivery of freight in transportation, both within and to and from points outside of the city.   The industrial sidings have, it may be said, more special character.   But upon this distinction no point is made in the argument and the District Court left it untouched in its decision, no doubt because in that court, as here, no emphasis was put upon the distinction.   In other words, because it was considered that it falls under the prin-

ciples which related to the team tracks; and we may so regard it.

The proposition of appellants is, as said by the District Court, that such service and team track service "are not in a proper sense transportation, but are essentially distinguishable therefrom"; or, to put it another way—and one which expresses more specially the contention of appellants—they are mere conveniences at the destination or initial point of the transportation and hence are terminal facilities merely and their use is not required to be given to other railroads. The District Court did not regard them in the latter character. After stating the conditions which exist in Detroit and its extent, the court said of them: "Such tracks are necessary to prevent the congestion which would result from requiring all carload freight, both in and out, to be delivered at the freight depots of the respective roads, and in a very proper sense are shipping stations." The court concluded that the services were transportation and that the statute of the State validly empowered the Commission "to require local transportation by a railroad between its own shipping stations within a city, whether such plurality of shipping stations has been voluntarily established by the railroad, as here, or has been required by the Commission under its lawful powers, and provided such transportation is for such substantial distance and of such a character as reasonably to require a railroad haul, as distinguished from other means of carriage." The court further said: "It is clear that a statute validly may, and the statutes we are considering do, authorize the employment of such depots, side-tracks, and team tracks of a railroad for transporting carload freight to and from the junction of such road with another road as a substantial part of a continuous transportation routing, where such junction is outside the city limits." And it was remarked that the fact that the freight movement begins and ends within

the limits of a city does not take from it its character "of an actual transportation between two termini," the other conditions obtaining. We concur in the conclusion of the court.

The extent of Detroit is about 22 miles, and its population about 500,000. The effect of the order is simply that the companies shall accept freight at the designated points for shipment to the other designated points. This, except in an extreme sense, is not a use of the tracks and terminals; or, rather, it is only a proper use—the use for which the roads were constituted to afford. An area of 22 miles is attempted by appellants to be localized and made a destination point. A city may, in a sense, be such a terminal unit, but considering the extent of Detroit, it is competent, we think, for the State under the conditions which this record presents to consider points within it the beginning and destination of traffic. And to call the service necessary to such intrastate movement of freight a taking of terminals is misleading and puts out of view the full signification of the question which the record presents, which is, Is there a distinct and sufficient movement between places which the companies can be required to perform, or which, to put it another way, constitutes transportation and therefore such as the companies were created to perform? That cars may be delivered or received is but an incident. The statute therefore is a regulation of the business of appellants, not an appropriation of their terminal facilities for the use and benefit of other roads. It is therefore justified by the doctrine of *Wisconsin &c. Rd. Co.* v. *Jacobson*, 179 U. S. 287. See also *Minneapolis & St. Louis R. R. Co.* v. *Minnesota*, 186 U. S. 257. In the *Jacobson Case* an order of the Railroad Commission of the State of Minnesota was considered which required two railroads of the State to make track connections. The statute of the State provided that all common carriers subject to its provisions

should provide at all points of connection, crossing, or intersection at grade, where it was necessary for interstate commerce, ample facilities for transferring cars used in the regular business of their respective lines of road from other lines or tracks to those of any other carrier whose lines or tracks might connect with, cross or intersect their own, and should provide facilities for the interchange of cars, and for the receiving, forwarding and delivering of passengers, property and cars to and from their several lines and those of other carriers connecting therewith, without discrimination in rates and charges. And it was provided that one carrier should not be required to furnish its tracks, equipment or terminal facilities to another without reasonable compensation, the cost of connections to be proportionately divided between the carriers; and in case of disagreement, it was to be settled by the Commission. The roads were required to establish reasonable joint through rates at the demand of any person or of the Commission. And it was provided that carload lots should be transferred without unloading the cars unless it be done without cost to the shipper or receiver and without unreasonable delay.

Under this statute track connections were required to be made by the Wisconsin &c. R. R. Co., with an intersecting road. In its answer before the State Railroad Commission it alleged that to construct a connecting track would require it to go outside of its right of way and to condemn land for that purpose. In addition it urged that to compel such connection would violate the commerce clause of the Constitution and the Fourteenth Amendment. The Commission directed the connection to be made and its order was affirmed by the local state court to which an appeal was taken, as provided by the statute. This court affirmed the order, deciding that it was a proper exercise of the power of regulation of the business of the companies. The reasoning to sustain this

conclusion need not be reproduced. It rested upon the ultimate proposition that railroad companies "are organized for the public interests and to subserve primarily the public good and convenience." And deciding this to be the purpose of the creation of the roads and that government had power to secure it, it was held that where a provision for regulation is reasonable and appropriate, when considered with regard to the interests both of the company and of the public, the legislation is valid and will furnish ample authority for the courts to enforce it, even though eminent domain must be exercised or cost incurred. This principle, illustrated by the facts of the case, is apposite to the regulation under review. If the establishment of track connections by intersecting roads with its necessary accessories of sidings and switches be required and acceptance and delivery of loaded cars as a convenience of transportation, surely team tracks and sidings in Detroit and the delivery and acceptance of loaded cars are as much so.

This view is not opposed by *Louisville &c. R. R. Co.* v. *Stock Yards Co.*, 212 U. S. 132. There a provision of the constitution of the State of Kentucky which required a carrier to deliver its cars to a connecting carrier was held invalid because it did not provide adequate protection for their return or compensation for their use. It was hence held that it amounted to a taking of property without due process of law. But the court was careful to say that "in view of the well-known and necessary practice of connecting roads, we are far from saying that a valid law could not be passed to prevent the cost and loss of time entailed by needless transshipment or breaking bulk, in case of an unreasonable refusal by a carrier to interchange cars with another for through traffic." The point of the decision was that compensation should be provided, and by the law. As it is expressed in the opinion, "The law itself must save the parties' rights, and not leave them

to the discretion of the courts." This as a condition was explained, for it was said: "We do not mean, however, that the silence of the [State] constitution might not be remedied by an act of the legislature or a regulation by a duly authorized subordinate body if such legislation should be held consistent with the State constitution by the State court." These conditions exist in the case at bar.

There is another part of the *Louisville &c. R. R.* v. *Stock Yards Case* which is more applicable to the contentions of the parties hereto and determine, it is urged, against the statute under consideration and the order of the Commission. The judgment reviewed required the railroad company to receive at its connection with the Southern Railway Company and to switch, transport and deliver all live stock consigned from the Central Stock Yards (the stock depot of the Southern Railway) to any one at the Bourbon Stock Yards (the stock depot of the Louisville & Nashville Railroad). This part of the judgment was based also upon the constitution of the State. We said: "If the principle is sound, every road into Louisville, by making a physical connection with the Louisville & Nashville, can get the use of its costly terminals and make it do the switching necessary to that end, upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road, for the purpose of reaching and using its terminal station. To require such an acceptance from a railroad is to take its property in a very effective sense, and cannot be justified, unless the railroad holds that property subject to greater liabilities than those incident to its calling alone."

It will be observed that the beginning of traffic was at the Central Stock Yards, the stock yards of the Southern, and was to be hauled by that road to its connection with the Louisville & Nashville, and by the latter from that

point to the Bourbon Stock Yards, the stock depot of the latter railroad. The yards were the terminals of the respective roads for live stock delivery, and the case turned upon the point that the roads were competitive, and that the point of delivery was an arbitrary one, and that thereby the terminal station of one company was required to be shared with the other company.

In the case at bar a shipper is contesting for the right, as a part of transportation. The order of the Commission was a recognition of the right and legally so. Considering the theater of the movements, the facilities for them are no more terminal or switching facilities than the depots, side tracks and main lines are terminal facilities in a less densely populated district. A precise distinction between facilities can neither be expressed nor enforced. Transportation is the business of railroads, and when that business may be regulated and to what extent regulated may depend upon circumstances. No inflexible principle of decision can be laid down. This was recognized in *Wisconsin &c. R. R. Co.* v. *Jacobson, supra.* There the court was careful not to say that under no circumstances could an order requiring track connections between intersecting roads be a violation of constitutional rights. "It would depend," it was said, "upon the facts surrounding the cases in regard to which judgment was given. . . . And in many cases questions of degree are the controlling ones by which to determine the validity, or the reverse, of legislative action." Indeed, no case could better illustrate the value of the principle than does this case, where the exceptional situation of Detroit as shown by the record, the relation of the tracks in controversy to that situation, their length and their functions, as respects the commerce of Detroit which in the nature of things they perform, not merely as instruments of terminal service and delivery, but of railway transportation in the completest sense, are essential and controlling factors in the determination of

·the question presented.   To which controlling conditions there must of course be added the fact that the railroad itself for a long period of time had recognized the situation and had applied the tracks to uses of transportation in the proper sense as distinguished from mere terminal service, a use which was only abandoned or sought to be abandoned when authority was exerted to prevent unreasonable and to secure reasonable charges for the services.

It is contended by appellants that the statute is void upon its face because the severity of the penalties preclude an appeal to the courts against its provisions except at such risks and costs that they should not be compelled to incur, and *Ex parte Young*, 209 U. S. 123, is adduced. But the provision for penalties is in a section by itself and when their enforcement is attempted their constitutionality can then be determined.   *Minnesota Rate Cases*, 230 U. S. 352; *Louis. & Nash. R. R. Co.* v. *Garrett, ante,* page 298.

As we have determined that the tracks or terminal facilities of appellants are not taken by the order of the Commission, we need not consider a subdivision of § 7 which provides that nothing in the act shall be construed as requiring any railroad to give the use of its tracks or terminal facilities to another railroad engaged in like business.

The contention of appellants that they were not incorporated for the purpose of intra-city transportation is untenable.   They were incorporated for the purpose of transportation, and geographical limitations under the circumstances which this record exhibits cannot prevail against the power of the State to regulate.

*Decree affirmed.*