**PITTSBURGH & W. V. RY. CO. v. UNITED STATES et al.**

No. 3075.

District Court, N. D. Ohio, E. D.

Dec. 11, 1929.

C. F. Taplin and H. H. Hoppe, both of Cleveland, Ohio (Taplin & Fillius, of Cleveland, Ohio, of counsel), for the Pittsburgh & W. V. Ry. Co.

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

Daniel W. Knowlton and Nelson Thomas, both of Washington, D. C., for defendant Interstate Commerce Commission.

W. C. Boyle, Clan Crawford, Charles F. Close, and Andrew P. Martin, all of Cleveland, Ohio (Squire, Sanders & Dempsey, of Cleveland, Ohio, of counsel), for defendant Wheeling & L. E. R. Co.

Charles W. Stage, W. H. Boyd, H. H. McKeehan, and L. C. Wykoff, all of Cleveland, Ohio (Boyd, Cannon, Brooks & Wickham, Dustin, McKeehan, Merrick, Arter & Stewart, and George W. Cottrell, all of Cleveland, Ohio, of counsel), for defendants Cleveland Union Terminals Co. and Cleveland Terminals Bldg. Co.

H. N. Quigley, of Cincinnati, Ohio, and C. C. Handy and W. N. King, both of Cleveland, Ohio, for defendant Cleveland, C., C. & St. L. Ry. Co.

E. A. Foote and T. H. Burgess, both of Cleveland, Ohio (Cook, McGowan, Foote, Bushnell & Burgess, of Cleveland, Ohio, of counsel), for defendant Erie R. Co.

Before DENISON and HICKENLOOPER, Circuit Judges, and JONES, District Judge.

## PER CURIAM.

Upon application of the Wheeling & Lake Erie Railway Company, hereinafter referred to as Wheeling, the Interstate Commerce Commission issued its certificate of public convenience and necessity (finance docket Nos. 7298 and 7299) certifying, in addition to making provision for temporary terminal facilities, that the present and future public convenience and necessity *required* Wheeling "to acquire passenger station facilities and service in the Union Depot of the Cleveland Union Terminals Company" and further that such present and future public convenience and necessity *permitted* Wheeling "to abandon the portion of its line of railroad, including its Ontario Street passenger station, all in the city of Cleveland, Cuyahoga County, Ohio, described in the application in Finance Docket No. 7299 and in the report" thereon. The two applications, the one to acquire terminal facilities in the Union Depot and the other to ' abandon Wheeling's present Ontario Street Station, are inseparably connected, were heard and determined together before the Interstate Commerce Commission, and the certificate of the commission is made the subject of the main inquiry in this action.

The Cleveland Union Terminals Company, hereinafter referred to as Terminals, was organized in the fall of 1918, for the purpose of constructing and operating a union depot in the city of Cleveland. The New York Central Railroad Company, its subsidiary the Cleveland, Cincinnati, Chicago & St. Louis Railway Company (hereinafter referred to as the Big Four), and the New York, Chicago & St. Louis Railroad Company (hereinafter referred to as the Nickel Plate) joined in the project as proprietary companies, consistent with sections 9160 et seq. of the General Code of Ohio, and on or about February 15, 1921, filed an application with the Interstate Commerce Commission (finance docket No. 1237) for authority and for a certificate of public convenience and necessity evidencing the Commission's approval to the purchase of the capital stock of the Terminals. This approval was given and the certificate issued under date of December 6, 1921, authorizing the New York Central to acquire seventy-one per cent., the Big Four twenty-two per cent., and the Nickel Plate seven per cent. of such capital stock. Such plans even then contemplated the necessity of securing Wheeling's Ontario Street passenger station site as part of the terminal project, and Wheeling accordingly filed an intervening petition before the Interstate Commerce Commission protesting the granting of the application of the proprietary companies on the ground that Wheeling was unable and unwilling to surrender its station site and that its financial condition did not permit of its entering the terminal. This protest was subsequently withdrawn under a stipulation that such withdrawal should be without prejudice to the rights of Wheeling in and to its station site. The terminal project has been progressively carried forward since the dates above referred to.

The project for the construction of the Union Station was approved by the city of Cleveland and an ordinance, No. 47,814, was enacted authorizing Terminals to proceed in accordance with the original plan. This ordinance was subsequently amended with the consent of the proprietary companies by requiring the construction of what is commonly called the Eagle Avenue ramp. This is a street or highway connection between the higher levels of the city and the river bottoms which were to be cut off from the higher levels by the construction of the terminal and the vacation of streets crossing the terminal properties. Prior to the construction of the Eagle avenue ramp it was entirely feasible and engineeringly possible for the lines of the terminal to pass beneath Wheeling's Station site and for both companies thereafter to operate their separate terminals. After the construction of the Eagle avenue ramp, this became a practical impossibility, necessitating one of two courses of action on the part of Terminals. Either that company must secure the Wheeling Station site, offering Wheeling use of the terminal upon terms which it could afford to pay, or an additional expenditure of some $10,000,000 must be made in the construction of an impractical "engineering monstrosity."

Since Terminals was making no progress in the direction of acquiring the Wheeling

Station site, the New York Central, the Nickel Plate, and the B. & O. Railroad Companies, which latter company had since joined as a prospective user of the terminal, each purchased, prior to May 1, 1927, and without the consent of the Commission, one-third of a controlling interest in Wheeling and proceeded to exercise such control in the election of the board of directors of that company. It is true that twelve of the fifteen original directors were re-elected, but the stock control of course tended to destroy freedom of action. Thereafter negotiations were continued and an agreement was reached as between the boards of directors of Terminals and Wheeling for the sale of the Ontario street passenger station site to the terminal company for $1,600,000, for providing a temporary terminal for Wheeling until the completion of the Union Station and thereafter for the use of the Union Station by Wheeling for a fixed term at a rental of $20,000 per annum for 3,000 trains of not more than 14,000 cars. The agreements of the proprietary companies and the B. & O. Railroad Company are founded upon a car use basis.

The purchase of the controlling interest of Wheeling by the B. & O., New York Central, and Nickel Plate was attacked by minority stockholders of Wheeling, as made without obtaining the approval of the Interstate Commerce Commission, and on March 11, 1929, such purchase was declared to be in violation of section 7 of the Clayton Act (15 USCA § 18) and an order of divestiture was made by the Commission. Interstate Commerce Commission v. B. & O. R. R. Co., 152 I. C. C. 721. This order was not, however, complied with prior to the entering into the contracts for the sale of Wheeling's Ontario Street Station and the use of the terminal.

On December 8, 1928, after the purchase of the controlling interest as aforesaid and the election of the board of directors by the B. & O., New York Central, and Nickel Plate companies, Wheeling filed its applications to acquire terminal facilities in the Union Depot and to sell its Ontario Street Station site to Terminals. Pending determination of these applications by the Interstate Commerce Commission a temporary contract permitting the terminal company to proceed with the work was entered into and was subsequently made the subject of the action of Wheeling & Lake Erie Railway Co. et al. v. Pittsburgh & West Virginia Railway Co. (C. C. A.) decided in 33 F.(2d) 390. Subse-

quently the Interstate Commerce Commission issued its certificate of public convenience and necessity as first above stated.

The present action is primarily one to annul and avoid such certificate of public convenience and necessity and to enjoin action thereunder and as therein authorized. The action is brought by the Pittsburgh & West Virginia Railway Company as a connecting carrier and stockholder of Wheeling against the United States of America, the Interstate Commerce Commission, the Wheeling & Lake Erie Railway Company, the Cleveland Union Terminals Company, the Cleveland Terminals Building Company, Erie Railroad Company, and the Big Four. The interest of the Big Four and the Erie Railroad Company in the litigation is found in that the certificates provide for temporary terminal facilities for Wheeling over the lines of the Erie and Big Four. The interest of the other defendants is obvious. Transcript of the entire evidence, proceedings, and orders before the Interstate Commerce Commission was offered and forms the record in the present cause.

As an intervener and protestant before the Interstate Commerce Commission and as a connecting carrier and stockholder of Wheeling, the Pittsburgh & West Virginia Railway Company is a proper party plaintiff in an action to challenge the validity of the order of the Interstate Commerce Commission. Chicago Junction Case, 264 U. S. 258, 267, 268, 44 S. Ct. 317, 68 L. Ed. 667.

Before considering the several specific grounds of attack, it should be observed that the courts will not interfere in the exercise of purely discretionary powers by the Commission nor can the court consider the weight of the evidence or the wisdom of the order, provided there was evidence before the commission to sustain it. Skinner & Eddy Corp. v. U. S., 249 U. S. 557, 39 S. Ct. 375, 63 L. Ed. 772; New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Chicago, R. I. & P. Ry. v. U. S., 274 U. S. 29, 47 S. Ct. 486, 71 L. Ed. 911. The scope of the jurisdiction of the district court under 28 U. S. C. § 41(28), 28 USCA § 41 (28) to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission, has been many times defined by the Supreme Court. Thus in Procter & Gamble Co. v. U. S., 225 U. S. 282, 293, 32 S. Ct. 761, 765, 56 L. Ed. 1091, referring to the provisions conferring jurisdiction on the court to entertain complaints as to affirmative orders of the commission,

the court said: "They give the court the right to take cognizance, when properly made, of complaints concerning the legality of orders rendered by the Commission, and confer power to relieve parties in whole or in part from the duty of obedience to orders which are found to be illegal." In Skinner & Eddy Corp. v. U. S., 249 U. S. 557, 562, 39 S. Ct. 375, 377, 63 L. Ed. 772, the findings of the commission are said to be conclusive "unless there was lack of substantial evidence, some irregularity in the proceedings, or some error in the application of rules of law." This language is repeated almost verbatim, in the case of Western Paper Makers' Chemical Co. v. U. S., 271 U. S. 268, 271, 46 S. Ct. 500, 70 L. Ed. 941. If the order attacked is made without supporting evidence, or where any essential finding is unsupported by evidence, the order will of course be held void. Chicago Junction Case, 264 U. S. 258, 265, 44 S. Ct. 317, 68 L. Ed. 667. A question of law alone is open to consideration, but even thus limited it would seem that such question of law may be whether the Commission proceeded upon an obviously erroneous construction of the law (cf. Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283, as explained in Chicago, R. I. & P. Ry. Co. v. U. S., 274 U. S. 29, at page 33, 47 S. Ct. 486, 71 L. Ed. 911); whether the facts found were insufficient in law to sustain the orders which were made (cf. Louisville & N. R. R. Co. v. U. S., 238 U. S. 1, 10, 35 S. Ct. 696, 59 L. Ed. 1177); or whether essential findings were not made or as made were not supported by evidence. Cf. Colorado v. U. S., 271 U. S. 153, 166, 46 S. Ct. 452, 70 L. Ed. 878.

The chief contention of invalidity of the certificate of public necessity and convenience relates to the question of validity of the contract of user on the part of Wheeling. It is insisted that the Cleveland Union Terminals Company is a carrier for hire under the Interstate Commerce Act (49 USCA § 1 et seq.) and within the control of the Interstate Commerce Commission, obligated to render service to all who apply without discrimination and expressly prohibited by the act from discriminating in rates and charges as between connecting lines; that Wheeling cannot afford to assume equality of financial obligation with New York Central, Big Four, Nickel Plate, or other companies which may subsequently avail themselves of the right to use the terminal, and is financially unable to assume a proportionate share of the capital charges or to pay rentals upon a strictly wheelage or car use basis; that a contract offering service at a lesser rate which Wheeling can afford to pay is invalid as preferential, and is subject to avoidance as discriminatory, and that the granting of the certificate of public convenience and necessity was wholly and erroneously predicated upon an assumption of the legality of such user contract.

If the contract for use of the terminal is to be held wholly illegal and void as preferential, it is manifest that Wheeling would never have applied for a certificate to dispose of its station site and to contract for terminal facilities. To annul and avoid such user contract would, in substance, be to compel the sale of its station site over the objection and against the will of Wheeling. An option is afforded Wheeling, if at any time dissatisfied with the service, to withdraw from the terminal and to receive $200,000 with which to construct a station elsewhere. However, this would manifestly compel the construction of such station in the bottoms and much farther and more inaccessibly located from the center of the city than the location either of the present Wheeling Station or of the Union Depot. To so deprive the company of central access to the city and of advantageous location of its terminal, at the only alternative of paying a ruinous rental for terminal facilities in the Union Depot, could not possibly be conducive to public convenience or necessity so far as Wheeling, the territory it serves or its public is concerned. To this extent, even in the absence of express finding (which appears in the opinion), the validity of the user contract must have been assumed or implied as a basis for the action of the Commission. Except upon such assumption the sale of the old station site and the use of the terminal or the acquisition of a new station less advantageously located might temporarily profit the stockholders, but could not fail to prejudice the public interest. In its opinion the Interstate Commerce Commission held "there appears to be no possibility of attack upon the terms of the contract" (viz., of user), and it is the soundness of this finding, as a matter of law, which constitutes the question here presented.

We do not think that it can be gainsaid that the establishment, construction, and operation of a joint terminal by interstate carriers falls within the provisions of the Transportation Act (41 Stat. 456) and comes within the powers of regulation of the Interstate Commerce Commission. Railroad Commission v. Southern Pacific Co., 264 U. S. 331, 342, 44 S. Ct. 376, 68 L. Ed. 713. Cf. Southern Pac. Term. Co. v. Interstate Commerce

Comm., 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310. There does not appear to be entire unanimity of opinion in prior adjudications as to whether as public carriers within the act and under the control of the Commission, such terminals must be opened to all railroads upon equal terms or whether such terminal companies are subject to the general rule of public service corporations requiring them to serve all who apply without discrimination. See St. Louis Terminal Railroad Association Cases, 224 U. S. 383, 32 S. Ct. 507, 56 L. Ed. 810; 236 U. S. 194, 35 S. Ct. 408, 59 L. Ed. 535; 266 U. S. 17, 45 S. Ct. 5, 69 L. Ed. 150; Grand Trunk Ry. of Canada v. Michigan Railroad Commission, 231 U. S. 457, 34 S. Ct. 152, 58 L. Ed. 310; Pennsylvania Co. v. U. S., 236 U. S. 351, 35 S. Ct. 370, 59 L. Ed. 616; Chicago Junction Case, 264 U. S. 258, at page 267, 44 S. Ct. 317, 68 L. Ed. 667; semble contra Louisville, etc., R. R. v. Central Stock Yards Co., 212 U. S. 132, 29 S. Ct. 246, 53 L. Ed. 441; Louisville & N. R. R. v. U. S., 242 U. S. 60, 73, 74, 37 S. Ct. 61, 61 L. Ed. 152; Manufacturers' Railway Co. v. U. S., 246 U. S. 457, 482, 38 S. Ct. 383, 62 L. Ed. 831. But suffice it to say that the true doctrine probably rests upon the fact that Congress has acted in assuming control of the interchange of traffic and compulsory use of terminal facilities, that the duties of the carriers are defined by the Transportation Act, and that the validity of the contract for the use of the terminals here involved must be determined by the provisions of such act.

■ The Interstate Commerce Act as originally enacted (24 Stat. 380) provided that its terms "shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." (§ 3.) This quoted provision has now been eliminated by amendment and by the enactment of specific provisions for compelling joint use of terminal facilities under conditions permitting the same. 49 U. S. C., § 3, par. (4), 49 USCA § 3(4). This section empowers the Commission to require the use of terminal facilities of one railroad by another "on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings." We are of the opinion that in amicable arrangements between carriers for the joint use of terminal facilities, this section supersedes the previous requirement of law, if any, as to exact similarity in terms

and empowers the railroads to agree upon terms which are just and reasonable, taking into consideration the financial condition of the contracting parties, the ability to pay, the use required, and all other surrounding circumstances.

It is insisted, however, that apart from the section just referred to, section 3 par. (3) of title 49 USCA offers an insurmountable obstacle. This section provides that carriers shall "afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines. * * *" This raises the question as to whether, under the circumstances of this case, the user contract of Wheeling might subsequently be held discriminatory as to charges for use of the terminal.

■■ The inhibition against discrimination requires only that equality of charge be made for contemporaneous service of the same or similar kind. Otherwise expressed, the act requires only that all shall be treated the same under the same or similar circumstances. In the present case it is not conceivable that any other carrier could possibly present the same or a similar situation to that occupied by Wheeling. The entire project of terminals is blocked by and dependent upon the matter of obtaining the Wheeling Station site. The construction of the Eagle Avenue ramp effectively destroyed all practical possibility of constructing the terminal without obtaining Wheeling's property. The contracts for the purchase of this property and for granting terminal facilities to Wheeling are wholly interdependent, and the cash consideration to be paid Wheeling is predicated not alone upon the strict value of the property as such, but rather upon its value in consideration of the substitution of another terminal. The two contracts must be considered as one and the consideration as single. Terminals must obtain the property, and considering the impossibility of condemning it or its acquisition otherwise than with the consent of Wheeling, the ability of Wheeling to pay, and other surrounding circumstances, a contract whereby Wheeling conveys the property for a cash consideration of $1,600,-000 and an agreement for substituted terminal use at a rental of $20,000 per year for Wheeling's contemplated needs, instead of a much higher rental which could only be obtained as income from the surplus of a much

higher cash consideration, appeals to the court as just and reasonable to both parties. No more satisfactory arrangement from either viewpoint, public interests considered, could be made.

While the Interstate Commerce Commission specifically held that it was without jurisdiction to prescribe the price at which the applicant (Wheeling) must dispose of its properties after abandonment, and while we think that this question, as well as the question of the validity of the user contract, was inseparably joined with the question of public convenience and necessity, since both were parts of an indivisible whole, the evidence upon the whole case was fully presented to the Commission and is now before this court, and we are unable to say that the cash payment and the user contract combined, as we believe they must be considered, do not constitute just and reasonable consideration adequately compensating and protecting Wheeling. Viewed in this light the finding of public convenience and necessity by the Commission appears amply supported by the evidence.

■ Complainant also contends that the certificate of the Commission is fatally defective in that the directors of Wheeling were wholly controlled by the same interests which controlled Terminals, and that the adverse interests of such directors of Wheeling invalidated and defeated their action upon the contracts. The existence of such adverse interests, to the extent that it might influence the exercise of fiduciary powers by directors, does not make void all actions of such directors. The contracts are not void but voidable. They are only to be scrutinized with the utmost care to determine their fairness. The minority interests are to be protected. If this question be open for consideration here, our previous findings must dispose of it.

■ Lastly, it is contended that the contracts of abandonment and user are illegal under the Ohio law in that they have not been approved by the required vote of the stockholders of either Wheeling or Terminals. Matters of procedure and conditions precedent controlling the action to be taken are within the jurisdiction of the Interstate Commerce Commission, and, Congress having acted by vesting power in such Commission under the circumstances here involved, requirements prescribed by the state must yield to the paramount control of the federal government. Colorado v. U. S., supra.

■ In addition to this answer to complainant's contention, it may also be said that these last two matters discussed constituted alleged private grievances as between complainant and but one of defendants (Wheeling) in which the other defendants are but indirectly and collaterally interested, if at all. In an action to set aside and annul an order of the Interstate Commerce Commission, such separate and severable causes of action against other defendants cannot properly be joined, collaterally raised, or considered by the court. Cf. Illinois Cent. R. R. Co. v. Public Utilities Comm., 245 U. S. 493, 505, 38 S. Ct. 170, 62 L. Ed. 425; Cleveland, C., C. & St. L. Ry. Co. v. U. S., 275 U. S. 404, 413, 414, 48 S. Ct. 189, 72 L. Ed. 338.

For the reasons above stated, we are of the opinion that the complainant's bill must be dismissed.

In thus directing the dismissal of the bill, we are treating the submission to us as one upon final hearing. We do not overlook the provision that plaintiff was entitled to offer evidence as to the so-called private grievances, unless the court should think that, as a matter of law, those alleged grievances must be excluded from consideration in this case. With our view of the validity and effect of the Commission's certificate, we think this exclusion follows, and that the case is therefore ripe for final decree. As to those issues we, in effect, sustain a motion to dismiss.

Nor do we overlook the possible confusion as to the power of this three judge court. As to the private grievances, jurisdiction seemingly exists by diverse citizenship, and those issues could be heard and decided by the local district judge. As he joins in this opinion and this dismissal, it seems to follow that, even if these issues do not go to the three judge court as incidental and collateral, yet the presence and concurrence of the other judges can do no harm. The decree is that of the district court. If counsel think that it is separable for purposes of appeal, they can preserve their rights thereto.

In this cause, plaintiff having made an application for a preliminary injunction, and the Honorable Paul Jones, District Judge, having thereupon and pursuant to section 47, title 28, U. S. Code (28 USCA § 47) called to his assistance the two Circuit Judges now sitting, and the motion having been heard and the cause also contingently submitted for final hearing, all as is recited in the former journal entries, and the three Judges having now filed their per curiam opinion directing the dismissal of the bill, it is ordered, the three Judges all concurring as appears by such

opinion, that the motion for preliminary injunction be denied, and that the bill be dismissed.