## ATWATER v. WHEELING & L. E. RY. CO. et al.

### No. 5830.

Circuit Court of Appeals, Sixth Circuit.
March 8, 1932.

H. H. Hoppe, of Cleveland, Ohio (C. F. Taplin and Taplin & Fillius, all of Cleveland, Ohio, on the brief), for appellant.

W. H. Boyd and Clan Crawford, both of Cleveland, Ohio (Charles F. Close, Andrew P. Martin, and Squire, Sanders & Dempsey, all of Cleveland, Ohio, on the brief), for appellees.

Before MOORMAN and HICKS, Circuit Judges, and HAHN, District Judge.

HAHN, District Judge.

The subject-matter of this action (and related matters) has been before the Interstate Commerce Commission: The Cleveland Passenger Terminal Case, 70 I. C. C. 342, reversed on rehearing, 70 I. C. C. 659; Directors of Wheeling & Lake Erie, 138 I. C. C. 643; Interstate Commerce Commission v. B. & O. R. Co., 152 I. C. C. 721; and Operation of Passenger Terminal Facilities at Cleveland, Ohio, by Wheeling & Lake Erie Railway Company, Finance Docket, Nos. 7298 and 7299, 154 I. C. C. 516; and before the courts: Wheeling & Lake Erie Railway Company v. Pittsburgh & W. V. Ry. Co. (C. C. A. 6) 33 F.(2d) 390, certiorari denied 280 U. S. 593, 50 S. Ct. 40, 74 L. Ed. 640; and Pittsburgh & W. V. Ry. Co. v. United States (District Court, N. D. Ohio, E. D. Statutory Court) 41 F.(2d) 806, affirmed, Pittsburgh & W. V. Ry. Co. v. United States, 281 U. S. 479, 50 S. Ct. 378, 74 L. Ed. 980.

The present action is by John J. Atwater, a minority preferred stockholder of the Wheeling & Lake Erie Railway Company; the action having been brought on behalf of the plaintiff and all such other stockholders who might desire to become parties to the action and join therein. The relief sought was an injunction to prevent and restrain the Wheeling & Lake Erie Railway Company from performing or in any wise carrying out a contract dated December 7, 1928, for the sale of its Ontario Street Passenger Site for $1,600,000 (that contract is hereinafter referred to as the option contract); and from performing or in any wise carrying out a contract dated November 27, 1928 (hereinafter referred to as the user contract), which provides for passenger service by the Cleveland Union Terminals Company (hereinafter referred to as Terminals), at the rate of $20,000 a year. For completeness injunctional relief was asked against other temporary contracts not necessary to detail.

Further injunctional relief was prayed for, the purpose of which was to enjoin Wheeling from doing those things which it is permitted to do by certificates of public convenience and necessity granted to it by the Interstate Commerce Commission. But plainly, the United States not having been a party, the granting of that relief did not come within the jurisdiction of the District Court. Pittsburgh & W. V. Ry. Co. v. United States, 281 U. S. 479, 50 S. Ct. 378, 74 L. Ed. 980; and Venner v. Michigan Central Railroad Co., 271 U. S. 127, 46 S. Ct. 444, 70 L. Ed. 868.

The facts which it is necessary to have in mind in the consideration of the present appeal are fully stated in Pittsburgh & W. V. Ry. Co. v. United States (D. C.) 41 F.(2d) 806, and 281 U. S. 479, 50 S. Ct. 378, 74 L. Ed. 980, and it is not necessary to repeat them here. The identical contentions made here were made in the above case, and on consideration of this record we are in accord with the conclusions there reached.

Wheeling proposes to abandon its Ontario Street Passenger Site, to sell the same, and to use the union passenger station of Terminals. The physical changes thus entailed are the abandonment by Wheeling of 1,035 feet of its line, the connection of its line with that of Terminals, and the use of Terminals' tracks for a few hundred feet more than 1,035 feet. Appellant argues that the first step is a change of its line, and the change of one of its termini by Wheeling within the meaning of section 8747 of the General Code, which permits such changes only upon the consent of three-fourths in interest of the stockholders of the company; and that it is likewise an aid and a sale of part of Wheeling's road to another railroad, and a lease of part of its railroad to another railroad, within the meaning of sections 8806–8809 of the General Code of Ohio, which require a favorable vote of at least two-thirds of the stock of each company. It is also argued that the second step proposed by Wheeling, that is, the use of

Terminals' tracks for a few hundred feet in excess of 1,035 feet, is an extension of Wheeling's line beyond its previously designated terminus, within the meaning of section 8772 of the General Code, which requires the assenting vote of a majority of Wheeling's stockholders. It is conceded that the consent of stockholders has not been obtained.

Section 8747 of the General Code was enacted as an original act on April 6, 1876, 73 Ohio Laws, p. 115. At that time new railroads were still being constructed in this state, and this statute, and other statutes passed as a part of the same act, were intended to apply to railroads then being constructed. The intention of the Legislature in enacting this legislation was the subject of consideration by Mr. Chief Justice Taft (then Circuit Judge) in Louisville Trust Co. v. Cincinnati Inclined-Plane Ry. Co. (C. C.) 91 F. 699, pages 704, 705. Referring to the sections of this act, he said: "They were intended to apply to a road which has been projected, and not completed. The change therein referred to is a change of plan before the plan has been executed. The change is a change of proposed lines and proposed termini, not an extension of a completed railroad. That is covered by section 3306. ⋆ ⋆ ⋆" (now Section 8772, General Code of Ohio).

It appears that prior to the enactment of this legislation and for some time thereafter, there was much litigation in the state of Ohio by subscribers to the stock of proposed railway companies who, after the proposed lines or proposed termini had been changed, sought to have the subscriptions to their stock canceled. Chapman v. Railway Co. (1856) 6 Ohio St. 120; Railway Co. v. Elliott (1859) 10 Ohio St. 57; Jewett v. Railway Co. (1878) 34 Ohio St. 601; Railway Co. v. Fisher (1883) 39 Ohio St. 330; and Armstrong v. Karshner (1890) 47 Ohio St. 276, 24 N. E. 897. This legislation was enacted for the purpose of defining the circumstances under which a subscriber to the stock of such proposed railroad might have the subscription to his stock canceled. The statute can have no application to a completed railway such as Wheeling.

The only statutes which may plausibly be claimed to be applicable to the situation which we have here are sections 504-2 and 504-3 of the General Code of Ohio, which deny the right to a railroad company to abandon its passenger station except with the allowance and consent of the public utilities commission of the state. This contention has heretofore been made by a stockholder of Wheeling, and the decision of this court and of the Supreme Court of Ohio were adverse. Wheeling & Lake Erie v. Pittsburgh & W. V. Ry. Co., 33 F.(2d) 390, certiorari denied 280 U. S. 593, 50 S. Ct. 40, 74 L. Ed. 640, and Pittsburgh & W. V. Ry. Co. v. Public Utilities Commission of Ohio, 120 Ohio St. 434, 166 N. E. 372.

It was held in Pittsburgh & W. V. Ry. Co. v. United States, supra, at page 811 of 41 F.(2d), that the operation of the other statutes relied upon has been superseded by the acts of Congress (see, also, Atchison, T. & S. F. R. Co. v. Railroad Commission, 283 U. S. 380, 391, 51 S. Ct. 553, 75 L. Ed. 1128). We are also of the opinion that under the laws of the state of Ohio these statutes requiring the vote and consent of stockholders would have no application to the present situation. The laws of the state of Ohio (General Code, §§ 9160–9169, pursuant to which Terminals was organized) authorize the incorporation of union passenger stations by "the presidents of two or more railroad companies running railroads to the same city, or village, by the consent and under the direction of their respective boards of directors." The act authorizes the building of such a union passenger station and permits the borrowing of money and the issuing of bonds for that purpose. The changes contemplated by Wheeling are those only which are necessary to enable it to use a union passenger station. It cannot have been the intention of the Legislature that a railroad company may participate in the incorporation and building of a union passenger station "by the consent and under the direction of (its) respective board of directors," and that it cannot make, except with the consent of its stockholders, such necessary minor and trivial changes in its roadbed and method of operation to use such union passenger station.

It is urged that both the option contract and the user contract are invalid because they were authorized by directors, a majority of whom were elected by stockholders who had acquired their stock in contravention of the Clayton Act, § 7, 15 USCA § 18 (see Directors of Wheeling & Lake Erie, 138 I. C. C. 643; and Operation of Facilities by Wheeling & Lake Erie Ry. Co., 154 I. C. C. p. 516 at pages 523 and 524); and also in contravention of section 8683 of the General Code of Ohio. This stock was purchased by the so-called proprietary companies who owned and held the stock of Terminals Company.

But it cannot be said that the effect of making the contracts here complained of was "to substantially lessen competition" between Wheeling and the other corporation, the effect which it is the purpose of the Clayton Act to condemn. Nor can it be said that the purpose in the making of these contracts was that "of restricting trade or competition," which is condemned by section 8683 of the General Code. And it has never been held that the acts of directors elected by stock so held are void or even voidable. The meritorious claim, if any, is that the directors thus elected had interests adverse to Wheeling. However, it appears from the evidence that the holders of the stock, which it is claimed was illegally acquired, elected substantially the same directors who had theretofore been acting for Wheeling; and that, therefore, substantially the same directors acted for Wheeling for the entire period here involved.

■■ The record also shows that officials of Wheeling were first approached with reference to the proposed new terminal station passenger site in 1918; that from that time on they had this project continuously before them; and that they made many investigations for the purpose of determining what course should be taken by Wheeling, and to what extent its own interests would permit co-operation in the new project. There is no evidence justifying the conclusion that these directors were dominated, controlled, or influenced by the change of stock ownership; and we are not justified in presuming that Wheeling's directors were in any sense unfaithful to their trust. Rogers v. Nashville, etc., Ry. Co. (C. C. A. 6) 91 F. 299; Rothchild v. Memphis & C. R. Co. (C. C. A. 6) 113 F. 476; and Leavenworth County Commissioners v. Chicago Ry. Co., 134 U. S. 688, 10 S. Ct. 708, 33 L. Ed. 1064. The evidence justifies only a contrary conclusion. However, having in mind the contention of appellant, we have in considering this case applied the rule which requires that the acts and conduct of directors having an adverse interest be subjected to the utmost scrutiny.

■■ Is the sum of $1,600,000, the consideration named in the option contract, a fair and reasonable price for Wheeling's Ontario Street Passenger Site? We have carefully examined the evidence bearing upon this issue, and in our opinion the testimony on behalf of the appellees as to the value of this site outweighs that of the testimony offered on behalf of the appellant. The lowest valuation placed upon this site by appellees' witnesses is $1,374,796, and the highest is $1,-600,000. These witnesses appear to be specially qualified to give their opinion as to the value of this site, and their testimony is impressive and convincing. We agree with the conclusion of the District Court that the consideration of $1,600,000 is a fair and reasonable one, of which the appellant has no just cause to complain in a court of equity.

It is asserted that the estimate of appellees' witnesses is very much too low because they were not instructed to value the air rights appurtenant to the property, and that they did not do so. The contention is variously stated, but it comes, it seems to us, to this: That there should have been a much higher valuation of this property because the air rights of this property are of particular or peculiar value to Terminals or its nominee.

Two of appellant's witnesses who reside near Cleveland made studies of the use and value of the air rights appurtenant to terminals in New York and Chicago; and it appears that the high value testified to by them was in a large measure due to the emphasis which they placed upon air rights appurtenant to Wheeling's property. Their theory seems to have been that had Wheeling sold or granted an easement merely for Terminals' purposes, the appurtenant air rights would have had a particular or peculiar value because of the limited use made of the surface right by Terminals; that these facts should receive special consideration; and that Terminals or its nominees, being about to receive the benefits of these air rights, should pay accordingly. But it is established by the evidence that rigidity of plan of construction is not permissible at the approach or throat of this terminal; that such plans must be kept flexible and change as experience may dictate; that, under the circumstances, the cost of building superstructures at this point of the terminal would be so excessive that it would be more economical to purchase adjoining and better located property in fee. This was the view of appellees' engineers and witnesses, and for that reason the latter did not fix their valuation upon the theory that these air rights had a special, particular, or peculiar value. See 154 I. C. C. 516, 527–528.

Further, in determining fair and reasonable market value, such special, particular, or peculiar value to a prospective purchaser only is not to be considered. United States v. Chandler-Dunbar Company, 229 U. S. 53, 79, 81, 33 S. Ct. 667, 57 L. Ed. 1063; and United States v. Boston, Cape Cod & New York Canal Co. (C. C. A. 1) 271 F. 877, 893.

Appellees' witnesses in arriving at their

values considered the value of adjoining properties over a period of years and the increases in values due to the development of the terminal project. These adjoining properties had similar air rights, and thus these witnesses followed a just and proper method of valuation which took into consideration the value of air rights. We agree with the trial judge that had a method of valuation been followed based upon the supposed greater future value of such air rights, a value largely conjectural and speculative would have resulted.

Nor can we say that the price of $1,600,-000 is not a fair and reasonable one because Wheeling's directors did not capitalize to the extremest extent the necessities of the Building Company. The opinions of appellant's witnesses, it seems to us, reflect the attitude of appellant in this respect. It would hardly be asserted, we think, that this property would have been worth anywhere near the sum of $1,600,000 but for the activities of those who brought about the terminal project, a project for the convenience and benefit of the public.[1] The corporate purposes of Wheeling, upon which its stockholders had a right to rely, and upon the faith of which they made their investment, are not inconsistent with the fair and reasonable attitude assumed by its directors. The complaint that its board of directors did not drive a harder bargain, or the hardest bargain, that it might have driven should have no appeal to a court of equity. On the contrary, courts of equity often proceed upon a contrary and opposite theory. Provident Life & Trust Co. v. Fletcher (D. C.) 237 F. 104, 109, affirmed (C. C. A. 2) 258 F. 583, 586; Haffner v. Dobrinski, 215 U. S. 446, 450, 30 S. Ct. 172, 54 L. Ed. 277; Pope Mfg. Co. v. Gormully, 144 U. S. 224, 236, 12 S. Ct. 632, 36 L. Ed. 414; and Fay v. Hill (C. C. A. 8) 249 F. 415, 420.

With reference to the claim that the user contract is unduly and unreasonably discriminatory and preferential; that it was not made under favor of paragraph 4 of section

3 of the Interstate Commerce Act, 49 USCA § 3 (4), because the latter paragraph is inapplicable; that the user contract was therefore subject to change at any time, either by the commission on its own initiative, or that of any party in interest; and that it therefore has no value—we are in accord with what was said at pages 809–811, of the opinion in 41 F.(2d) 806.

We have considered I. C. C. v. Los Angeles, 280 U. S. 52, 50 S. Ct. 53, 74 L. Ed. 163, announced shortly before that opinion but not noticed therein; and Atchison Ry. Co. v. Railroad Commission, 283 U. S. 380, 51 S. Ct. 553, 75 L. Ed. 1128. The effect of these cases is to limit the applicability of paragraph 4 of section 3. It does not in our opinion affect the application of that paragraph and section to this case. On the contrary, it announces a broad and liberal principle of interpretation and construction, favorable to appellees' contention. It was held in that case that section 1, paragraphs 18 to 21 of the Interstate Commerce Act, 49 USCA § 1 (18–21), containing no limitation (page 393 of 283 U. S., 51 S. Ct. 553, 556), and these paragraphs not excluding such action, the state as well as a railroad company may invoke the power of the commission to issue certificates requiring carriers to construct a union passenger station terminal involving readjustment of trackage.

It may be added that in the opinion in 41 F.(2d) at page 809, it was said that to a certain extent the "validity of the user contract must have been assumed or implied as a basis for the action of the Commission." And Mr. Justice Brandeis, writing the opinion of the court, in 281 U. S. 479, page 484, 50 S. Ct. 378, 380, 74 L. Ed. 980, in reviewing the holdings of the commission, said that the commission held "that, under paragraph (4) of section 3 of the Interstate Commerce Act (49 USCA § 3 (4), the agreed rental for the Wheeling's use of the Union Station was not subject to be increased by it; and that, in view of all of the circumstances, the rental was not unduly preferential of the Wheeling." While the holding of the commission in this respect may not be res judicata (compare Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 52 S. Ct. 183, 186, 76 L. Ed. —), there is authority for the proposition that where a sovereignty has spoken through a commission, its action is final. Venner v. New York Central & H. R. Co., 177 App. Div. 296, 343, 164 N. Y. S. 626, 657, affirmed without report 226 N. Y. 583, 123 N. E. 893,

---

[1] While not in any sense conclusive, it is significant that in the report of Wheeling's management to its executive committee, Exhibit 48, under date of July 2, 1928, it reported that the 74,780 square feet owned by it in fee was carried on the tax duplicate for the year 1927 at $142,250, an amount which may be conceded to be very low; and that the Interstate Commerce Commission in valuation proceedings against the company had tentatively fixed the value of the same property at $313,784.75, as of 1918. The company's claim before the Interstate Commerce Commission at that time was for a valuation of $531,561.50. Wheeling's officials were first approached with reference to this project in 1918.

certiorari denied 249 U. S. 617, 39 S. Ct. 391, 63 L. Ed. 803.[2]

Even if the action of the commission was not final and is subject to change (a question which we need not decide), the appellant is not entitled to enjoin the execution of the user contract. No action on the part of the commission is now impending, and for some time to come at least it seems the user contract will be of great benefit and value to Wheeling. If the commission has power and authority to change the contract, we may not assume that its action will be unfair to Wheeling or financially ruinous to it. No doubt if the commission further considers the terms of the user contract, it will be influenced by all the facts and circumstances which led the parties to enter into the present user contract, and fully consider the ability of Wheeling and its public to pay a higher rate for the services of Terminals. If Wheeling exercises its option it will procure the sum of $1,600,-000. That sum invested at so low a rate of interest as 4 per cent. will yield more than three times the present annual rental stipulated in the user contract.

The user contract provides for an option of renewal after termination of the first twenty-five years of the contract, and that the rental may then be increased; but such increase must be justified by the increase in operating costs directly attributable to the service rendered by Terminals to Wheeling. We cannot say that if these operating costs increase they would not also have increased to Wheeling had it continued to use its own station site. It is enough that in this case we cannot say that it was not good business policy to enter into the user agreement in conjunction with the option contract.

Upon the whole case we are of the opinion that the acts and conduct of Wheeling's directors were fair, just, and equitable to Wheeling and its stockholders, and that, at the same time, the public interest has been served.

Whether discussed in this opinion or not, we concur in the findings of fact made by the trial judge; and we also concur in his conclu-

sions of law, except that we have found it unnecessary to decide whether Terminals is a common carrier at common law or under section 1, title 49, United States Code (49 USCA § 1), or under the statutes of the state of Ohio.

The decree of the District Court is affirmed.

[2] This was a suit to compel the dissolution of a consolidation of railway corporations theretofore authorized by various states through which the roads passed. Upon the question of res judicata, the court said: "The consent of the commission is the consent of the several sovereigns to whom the constituent companies are amenable, so far as the commission represents the state and has authority to do the act. The decision is not res adjudicata in the sense that it is judicial, but it is final in the sense that through it the state speaks."